KELLEY, ADMR. *v.* SPORTMEN'S SPEEDWAY, INC., et al.

No. 39526　　　June 13, 1955　　　80 So. 2d 785

*Sams & Jolly,* Columbus, for appellant.

*Sims & Sims,* Columbus, for appellees.

Kyle, J.

This case is before us on appeal by Esom J. Kelley, Administrator of the Estate of Franklin D. Kelley deceased, plaintiff in the court below, from a judgment of the Circuit Court of Lowndes County, in favor of Sportsmen's Speedway, Incorporated, and others, defendants in the court below, in an action for damages for the wrongful death of Franklin D. Kelley, deceased.

The record shows that the Sportsmen's Speedway race track was located about 100 yards south of U. S. Highway No. 82, six miles east of the City of Columbus. The race track grounds were enclosed by a wood-paling fence, 8 to 12 or 14 feet high. The track itself was a dirt surfaced circular track a quarter of a mile in length. There were two gates leading into the race track grounds. West of

the entrance, between the fence and the race track proper, there was an area called the "pit," where the stock cars which were to be entered in the races were assembled and made ready for the races. The race track proper was out in front of the pit and was elevated 2½ or 3 feet above the level of the pit. On the right, as spectators entered the enclosure, there was a grandstand, north of the race track, next to the highway. The grandstand was approximately 150 feet from the gate; and in front of the grandstand, where the spectators sat, there was a heavy barricade fence, built out of 2 x 10 and 2 x 12 timbers fastened to crosstie posts, approximately 12 feet high, with chicken wire strung between them. There was a light fence made out of 1 x 4 oak timbers painted white around the track in front of the pit, which marked the outside edge of the track. The fence was 3 feet high, and was not strong enough to stop a car or a wheel that ran off a car.

Stock cars that were entered in the races were old model vehicles braced up and reinforced on the inside, with the motors reworked and the power stepped up. Such cars were equipped with bracket type seats firmly fastened to the frames and bolted to the inside of the car. The seats were equipped with safety belts, and the drivers wore crash helmets. The pit was the place where the stock cars were kept while they were not actually engaged in a race. According to the rules of the corporation, no one was allowed in the pit without signing a release, and pit passes were issued to persons entitled to be admitted. Only drivers, owners and mechanics were expected to enter the pit, and the number of persons to be admitted with each car was limited to three.

Franklin D. Kelley was fatally injured during a Sportsmen's Speedway racing exhibition at the race track on the night of April 26, 1952, when he was struck by a flying wheel which had broken off of a 1934 model Ford stock car driven by Clarence Riley. Kelley died as a result of his injuries a few minutes later. At the time of

his injury Kelley was standing in the pit area of the race track grounds about 25 or 30 feet from the track. The wheel came off the car as the car rounded the curve in front of the pit, and the car turned over. The driver of the car testified that he had examined the car before the races started, and there were no visible defects in the car. He had driven five or six laps around the track when the wheel came off. The car was examined after the wreck, and it was found that the hub of the right front wheel was broken and the break in the hub was a fresh break.

The declaration in this case was filed by Esom J. Kelley, Administrator, against the defendant corporation an the stockholders and managers in charge of its affairs, for the benefit of the father and mother, the sister and the two brothers of the deceased. The individual defendants, who were sued along with the corporation, were A. B. Green, W. V. Holley, R. R. Beaty, S. H. Oglesby, who is referred to in the record as Jack Oglesby, and Clifton S. Wade. In his declaration the plaintiff alleged that the deceased was employed by the defendants as a messenger boy at the time of his injury, and that immediately prior to his injury he was ordered and directed by Clifton S. Wade, one of the active managers of the race track, to go into the pit area where the automobiles were assembled prior to their entry into the races, and deliver a message to some person in the pit, and that while he was in or near the pit he was fatally injured by the wheel that came off the racing car. The plaintiff alleged that Kelley's death was caused by the defendants' negligence in failing to ascertain the faulty condition of the automobile from which the wheel escaped, and in failing to have proper safeguards erected around the race track to protect persons in or about the pit area from injury, and in failing to furnish the deceased with a safe place to work.

The defendants in their answer denied that the deceased was employed to work at the race track during

the racing exhibition or that he was on duty as an employee of the defendants at the time of his injury. The defendant's denied that it was their duty to place a fence or enclosure around the area outside the race track referred to as the pit, or that they were negligent in failing to inspect the automobiles engaged in the races prior to their entry into the races, or that they were negligent in any manner in operating the race track, or that they had failed to furnish any of their employees a safe place to work. The defendants admitted in their answer that there was no fence around the pit; but the defendants averred that it was not the practice of race track owners and operators to put fences around the pit area, that spectators had no right to be in or around the pit; and that the deceased was a spectator. The defendants averred in their answer that there was a very strong fence around and in front of the grandstand; that spectators were warned to stay away from the pit; and that the deceased had been told by Clifton S. Wade, one of the managers, only a few minutes before he was injured, that he was not wanted to deliver any messages, and that he should get in the grandstand and get him a seat before the next race started; and that the defendants were not in any way responsible for the injury and death of the deceased.

Clifton S. Wade was called to testify as an adverse witness for the plaintiff. After describing the layout of the race track grounds, Wade testified that Oglesby was in charge of the pit during the night the accident occurred. Wade himself was stationed in the center of the circle inside the track. Holley and Green handled the messages that had to be sent to Oglesby as the judges made their announcements concerning the cars that were to be entered in the next race. Wade stated that Franklin Kelley had been employed, along with the other school boys, during the day to help in getting the track ready for use; but the stockholders had adopted a rule that no minors should be permitted to work at night, and Wade had told

the boys that none of them would be used that night. Wade stated that he had seen Franklin Kelley in the center of the track circle 15 or 20 minutes before the accident occurred, and that he had told him to go behind the fence and stay away from the track. Wade stated that he had sent no messages of any kind by Franklin Kelley during the night.

Robert Ashcraft and Sam Ashcraft, who had attended the New Hope School with Franklin Kelley, testified as witnesses for the plaintiff. Robert testified that he was in the pit selling soft drinks and was standing right behind Franklin Kelley when the car wheel struck him. He did not think Franklin ever knew what hit him. Mr. Oglesby was standing close by. They were 25 or 30 feet from the race track. On cross-examination Robert stated that the managers had a loudspeaker on the grounds and he heard them warn the spectators to stay out of the pit. Sam Ashcraft testified that he too was in the pit at the time the wheel struck Franklin Kelley. He was just a spectator. He stated that the wheel that struck Franklin Kelley struck him also and went on through the fence. Sam stated that he had worked for the Sportsmen's Speedway during the day, but was not working that night. The managers had told him that they did not want him and the other boys to work at night, but, he added, no one had told him to leave the pit. Sam and Robert both testified that there was a double fence in front of the grandstand to protect the spectators, but that fence did not protect the pit area.

Jerry Kelly, Franklin's brother, was the only witness who testified positively that Franklin was working for the Sportsmen's Speedway when the accident occurred. Jerry testified that Franklin was carrying messages from Mr. Wade to the pit; and Jerry stated that he also was helping but was not being paid for his services. Esom J. Kelley, the plaintiff, and Mrs. Edra Ann Kelley, Franklin's mother, and Peggy Ann Kelley testified that Mr. Wade stated to Mrs. Kelley when they called to see him

at his home the day after Franklin was killed, that he felt responsible for Franklin's death because he had sent Franklin into the pit with a message. Wade was recalled later and testified that he had not made such statement to Mrs. Kelley.

Jack Oglesby, the pit manager, testified that the flying wheel that struck Franklin Kelley struck him also on the arm. He stated that he had not seen Franklin Kelley in the pit prior to the time he was hit. Franklin Kelley had brought him no messages at any time during the night. Oglesby was asked whether Franklin Kelley had a pit pass. His answer was, "No, sir, if he did, I didn't see it while we were putting him in the ambulance." Oglesby and G. C. Hughes both testified that they were present at Mr. Wade's house on Sunday afternoon when Mrs. Kelley and her daughter came there to see Mr. Wade, and they did not hear Mr. Wade say anything about it being his fault that the boy was killed, or about his having sent the boy into the pit with a message.

Wayne Beaty, who was 15 years of age at the time of the trial, testified that he and the other boys who were working at the Speedway race track during the day quit work about 4 o'clock. Wayne stated that he and Franklin Kelley and Seldon Ellis were on the race track together that night; that Franklin Kelley asked Mr. Wade whether he wanted him to help him, and Mr. Wade told him that he did not need anyone to help him; and Mr. Wade then told the boys to go back and get in the grandstand. Mr. Wade then walked to the edge of the track with them. Wayne stated that after Mr. Wade left them they did not go to the grandstand, as Mr. Wade had told them to do, but they went down to the pit. Wayne stated that announcements were made over the loudspeaker urging people to stay clear of the track and to stay out of the pit, but, he added, no one came down to the pit and asked him to get out.

W. V. Holley testified that he performed the duties of messenger the night that Franklin Kelley was killed,

and carried the messages from Wade to Oglesby; that he saw Franklin Kelley walk up to Mr. Wade and ask him if he wanted him to be a messenger that night; and that Wade told him, No, the stockholders had voted against using minors while the races were going on; and Wade then told him to get a good seat and enjoy the races. Holley stated that he heard the conversation that took place between Wade and Mrs. Kelley at the Wade home the day after Franklin Kelley was killed, and that Wade did not say to Mrs. Kelley, while he was present, that it was his fault, that he had sent Franklin out there with a message. Mrs. A. B. Green testified that it was her duty to stand at the pit gate and see that all drivers, car owners and mechanics who entered the pit area signed releases and obtained pit passes before entering the pit, and that she issued no pit passes to Franklin Kelley or any of the other boys that night. She stated that there was a sign at the entrance to the pit which read, "Enter at your own risk," and that announcements were made from time to time over the loudspeaker warning spectators to stay off the field. A. B. Green testified that he told Franklin Kelley and the other boys who were with him just before the races started to get behind the fence, up in the bleachers, and not to come back out in the middle of the track.

At the conclusion of the evidence the court instructed the jury for the plaintiff that it was the duty of the defendants to keep the race track and adjacent premises reasonably safe and free from dangers which were likely to arise during the races, including the duty to provide sufficient barriers around the race track to protect spectators and persons lawfully on the premises from injuries caused by high speed cars going around the track, and to exercise due care to avoid injury to members of the public who attended the races and to avoid injury to persons who might be employed by the defendants and working for them; and if the jury believed from the evidence that the defendants negligently failed

to take such proper precautions and provide sufficient barriers to prevent injuries to the deceased and other persons lawfully on the premises, and that as a proximate result of such negligent failure the deceased was injured and killed, it was the duty of the jury to return a verdict for the plaintiff. The court also instructed the jury for the plaintiff that, although they might believe from the evidence that the defendants had posted warning signs around the pit, still, if they believed from the evidence that the defendants had acquiesced in or permitted the deceased to be in and around the pit at the time he lost his life, the defendants owed him a duty to use reasonable care not to injure him.

The court granted four instructions to the defendants, in which the jury was told that, if they believed from a preponderance of the evidence that the deceased was not an employee of the defendant corporation at the time of the accident and that he had no business on the race track or around the pit, and that he was told to go to the grandstand, but failed and refused to do so, and that his presence at the pit was unknown to the defendants, then he was a trespasser, and the defendants owed him no duty other than to use such care as not to injure him wantonly and wilfully.

The case was submitted to the jury on the testimony of the witnesses and the above mentioned instructions, and the jury returned a verdict for the defendants.

The first point argued by the appellant's attorneys as ground for reversal on this appeal is that the court erred in granting the defendants' instructions which permitted the jury to find that the plaintiff's decedent was a trespasser in the pit area at the time of his fatal injury.

But we think there was no error in the action of the trial judge in submitting to the jury the question whether the decedent was a trespasser and not an employee of the defendant corporation, as alleged in the plaintiff's declaration, at the time of his injury. The defendants' theory of the case was that the plaintiff's decedent was not an employee of the corporation at time he was killed,

but a trespasser who had entered the danger zone of the pit for his own purpose and after he had been warned to stay out of the pit; and the defendants had a right to have their theory of the case presented to the jury under proper instructions.

If the decedent was not working for the defendants at the time of his injury, he was a mere spectator, and his status, when he entered the race track grounds, was that of an invitee or a licensee. It was the duty of the appellees to provide the necessary safeguards to protect him from the hazards that could be reasonably anticipated, and to exercise due care to avoid injuring him. 52 Am. Jur., p. 314, Theaters, Shows, Exhibitions, etc., par. 69; Anno. 22 A. L. R. 657, 658; Anno. 37 A. L. R. 2d, 391. But the pit area, according to the testimony, was an area set apart by the managers for the use of the owners and drivers of cars which were to participate in the races, and for the use of the mechanics employed to service the cars. Spectators were neither invited nor expected to enter the pit areas and were warned to stay out of the pit area. When the decedent entered the pit area, if he was not an employee of the corporation, he was a mere licensee or a trespasser. He could no longer claim the status of an invitee.

A licensee is broadly defined as a person who enters upon the property of another for his own convenience, pleasure or benefit. In order to constitute the person so entering a licensee, his entrance upon the property of another must be pursuant to the license or implied permission of the owner. 38 Am. Jr., 765, Negligence, par. 104. "* * * Ordinarily, a licensee who chooses to remain on premises where danger is patent takes on himself all natural and probable results of the danger, whether it results from a condition in the land or in appliances thereon, and whether the licensee is a gratuitous licensee or one who has paid for the privilege of entering upon the premises." 38 Am. Jur., p. 769, Negligence, par. 105.

A trespasser is a person who enters the premises of another without license, invitation, or other right, and intrudes for some definite purpose of his own, or at his convenience, or merely as an idler with no apparent purpose, other than, perhaps, to satisfy his curiosity. An owner owes trespassers no duty to keep his premises in a safe condition for their use, and as a general rule, he is not held responsible for an injury sustained by a trespasser upon the premises from a defect therein. 38 Am. Jur., 771, Negligence, par. 109.

If the jury believed from the evidence that Franklin Kelley was not working for the defendants at the time of his injury and that he had been warned of the dangers to which he was exposed and had been ordered to get in the grandstand, where he would be protected from such dangers, as testified to by Clifton S. Wade, Wayne Beaty and A. B. Green, the jury had a right to believe that he was a trespasser and that the defendants owed him no duty other than not to injure him wilfully or wantonly. Indianapolis Motor Speedway Co. v. Shoup (1929), 88 Ind. App. 572, 165 N. E. 246; Aughtrey v. Miles, (1917), 106 S. C. 416, 91 S. E. 303.

It is argued, however, that the appellees were in complete control of the operations of the race track and that it devolved upon them to keep the spectators out of the perilous area by means of a fence or other barricade similar to that erected in front of the bleachers. And the appellant cites in support of his contention on this point Kuemmel v. Vradenburg, (1951, Tex. Civ. App.), 239 S. W. 2d 869, and Ellingson v. World Amusement Serv. Asso. (1928), 175 Minn. 563, 222 N. W. 335. But the facts in each of those cases were entirely different from the facts in this case. In the Kuemmel case, one of the racing cars left the track and proceeded across the space between the track and a barrier composed of cables stretched on cedar posts, collided with the automobiles parked on the spectators' side of the fence and hit a three-year-old child, causing severe and perma-

nent injuries. The court held that there was sufficient evidence to support the jury's finding of negligence on the part of the defendants in failing to provide a barrier of sufficient strength to protect the spectators. In the Ellingson case it was shown that the promoters had admitted a much larger number of spectators than they had provided seats for, and that they had failed to provide a fence to keep patrons outside the "neutral zone" and it was also shown that the promoters had permitted the races to be conducted upon a track known to be improperly constructed and in an unsafe condition.

In the Kuemmel case the court held that the duty owed by the defendants to spectators lawfully present was the duty to exercise ordinary care to protect them from injury; and the court noted in its opinion that the child plaintiff and his parents in that case never got beyond the spectators' side of the protecting barrier, and that the child never ceased to be an invitee to whom the duty was owed. Automobiles belonging to spectators were parked alongside the barrier. In the Ellington case, the court based its decision primarily on the failure of the promoters to provide barriers to keep the spectators who could not be seated in the grandstand from coming in dangerous proximity to the track along which the speeding cars were to run. It can be readily seen that the basis of liability in each of those cases was entirely different from the basis of liability which the appellant seeks to establish in this case.

It is next argued that even if the decedent was not an employee and was not working for the appellees at the time he was injured, and even if he had been ordered by two of the managers to get in the grandstand where he would be safe and had been warned by the loudspeaker to stay out of the pit, the appellees still owed him the duty of exercising reasonable care for his safety after he entered the pit. And the appellant cites in support of this contention the cases of Colgrove v. Lompoc Model T Club, Inc., (1942), 51 Cal. App. 2d 18, 124 P.

2d 128, and Virginia State Fair Asso., Inc., v. Burton (1944), 182 Va. 365, 28 S. E. 2d 716.

In the Colgrove case the plaintiff's injuries were due to the active negligence of the driver of the automobile which went out of control and struck the plaintiff after the races had been finished and the plaintiff was walking toward his car. And the Court in its opinion in that case applied the rule laid down in Yamauchi v. O'Neill (1940), 38 Cal. App. 2d 703, 102 P. 2d 365, wherein the Court said: "* * * there can be no doubt whatever that the negligent operation of a moving vehicle in a space where the operator has good reason to expect the presence of licensees constitutes active negligence as distinguished from passive negligence. Under such circumstances the duty owed by the operator of the moving vehicle to a licensee, whether such operator be the licensor or any other person, is not merely the duty to refrain from wilful or wanton conduct but it is the duty to exercise ordinary care."

In the Virginia Fair Association case the record showed that, when the decedent entered the fair association premises to witness the automobile race, he found that seats in the grandstand had been taken, and he and his companion joined a large crowd lining the outer edge of the race track. There were neither permanent barriers to prevent the spectators from approaching the fence surrounding the track nor safety zones laid out or designated on the ground to indicate to the spectators that there was danger in their being close to the track. The driver of one of the cars, in a trial run, lost control of his car because the right rear tire had been deflated by a large nail or spike, and the decedent was killed when the car left the track at a curve, crashed through the fence and rolled down the embankment outside the track into the crowd of spectators. The testimony showed that shortly before the accident two police officers had observed a number of loose spikes and large nails scattered along the surface of the track. A judg-

ment for the administrator against the fair association, but in favor of the defendant driver, was affirmed on appeal. The Court held that the jury was warranted in finding that the association was negligent in not providing a safety zone around the track and in not providing sufficient barriers to keep the spectators who could not be seated in the grandstand from coming in dangerous proximity to the track, and in not discovering the loose nails or spikes which were found there shortly after the accident.

But the rule stated in the Yamauchi case and applied in the Colgrove case is not applicable to the facts in this case. It does not appear that Franklin Kelley was injured as a result of the active negligence of the appellees or the driver of the stock car. It is not claimed that there were not sufficient seats in the grandstand to accommodate the crowd, as in the Virginia Fair Association case, or that there was any substantial reason why Franklin Kelley should not have availed himself of the protection afforded by the double wire barricade in front of the grandstand.

It is next argued that there was no testimony in the record to support the appellees' claim that the decedent was a trespasser. But we think this contention is not borne out by the record. The testimony showed that the pit area was a space set apart for the assemblage, storage and servicing of the stock cars which were to be entered in the races, and only the car owners, drivers and mechanics and other employees were entitled to enter the pit, and each of them was expected to obtain a pass before entering the pit. The decedent was not a car owner, driver or mechanic, and the jury had a right to believe from the evidence that he was not an employee of the corporation at the time he was injured, and that he was in the pit without the appellees' permission. Under these circumstances we think that it cannot be said that there was no evidence in the record to support the appellees' claim that the decedent was a trespasser.

██ " Where a person while lawfully on the property of another or on public property as an invitee leaves that portion of the property on which he has been invited, or uses the property on a venture in his own interests and not within the scope of his invitation or purpose for which the property was reasonably intended, he loses his status as an invitee and becomes a trespasser, * * *." 65 C. J. S. 437, Negligence, par. 23 b.

If the decedent was a trespasser in the pit area, the defendants owed him no higher duty than not to injure him wilfully or wantonly. 65 C. J. S. 438, Negligence, par. 24a; Campbell v. Willard, 205 Miss. 783, 39 So. 2d 483; Roberts v. Mississippi Power & Light Co., 193 Miss. 627, 10 So. 2d 542.

██ Finally, it is argued that the judgment of the lower court should be reversed because of errors in the defendants' instructions numbered 1, 2, 3 and 5, in which the word "and" was used instead of the word "or" in referring to the duty of the defendants to refrain from "wilfully or wantonly" injuring the deceased. The instructions are improperly worded, and should not have been given in the form requested. The word "or" should have been used instead of the word "and." But under the facts in this case we do not think that the errors complained of were misleading or prejudicial. The question whether the decedent was in fact a trespasser at the time of his injury was properly left for the jury to decide. But whatever the decision may have been on that question, we think there is no evidence in the record that would have justified a finding that the defendants injured the decedent either wilfully or wantonly; and the erroneous use of the word "and" in the instruction, instead of the word "or," was harmless.

We find no reversible error in the record, and the judgment of the lower court is affirmed.

Affirmed.

*Roberds, P. J.,* and *Arrington, Ethridge* and *Gillespie, JJ.,* concur.