379 So.2d 301 (1980)
Larry HUGHES, Parent of Larry Hughes, Jr., Deceased, a Minor,
v.
STAR HOMES, INC. and David Pritchett.
No. 51152.
Supreme Court of Mississippi.
January 16, 1980.
*302 Williams, Glover & Walton, Ronnie L. Walton, H. Wingfield Glover, Jr., Meridian, for appellant.
Snow, Covington, Temple & Watts, Arlo Temple, Walter T. Rogers, Harvey B. Ray, Warner, Ray & Cobb, Meridian, for appellees.
EN BANC.
SUGG, Justice, for the Court:
Larry Hughes filed suit against Star Homes, Inc. and David Pritchett in the Circuit Court of Lauderdale County for the wrongful death of Larry Hughes, Jr. Plaintiff filed the action under the wrongful death statute, section 11-7-13 Mississippi Code Annotated (1972), for the benefit of all parties entitled to recover for the wrongful death of Larry Hughes, Jr.
The jury returned a verdict for the defendants. Plaintiff appealed and defendants have cross-appealed asserting that they were entitled to a peremptory instruction. We have determined that the defendants were entitled to a peremptory instruction; therefore, it is not necessary to reach the questions presented by the direct appeal.
Larry Hughes, Jr. was ten years of age at the time of his death and lived with his family on a lot adjoining Lots 9 and 10 of Mt. Olive Estates Subdivision in rural Lauderdale County. Star Homes, a Mississippi corporation, was engaged in development of the subdivision and had virtually completed the construction of the houses on Lots 9 and 10. David Pritchett had a contract with Star Homes to install septic tanks for the houses under construction on Lots 9 and 10.
On the day that Larry was killed, Pritchett arrived on the job site between 8:00 and 8:30 o'clock a.m. He made an excavation for a septic tank on Lot 9 and placed the septic tank in the excavation shortly after it was delivered between 9:00 and 10:30 *303 o'clock a.m. The septic tank was made of concrete and was eight feet long, four feet wide, and five feet deep. The cover for the septic tank consisted of four rectangular concrete slabs weighing between one hundred and two hundred pounds. Each of the slabs was two feet wide, four feet long and four inches thick.
It was necessary for the septic tank to be inspected by a representative from the Lauderdale County Health Department. In order to facilitate the inspection, Pritchett removed the two end slabs and stood them on their four inch sides at each end of the septic tank. The two end slabs of the cover then extended two feet above the top of the septic tank permitting a view of the interior. The slabs were firmly in place although not anchored or braced and, according to the evidence, this was the common and accepted practice used to prepare a septic tank for inspection. After inspecting the septic tank on Lot 9 the Health Department representative proceeded to Lot 10 to inspect the septic tank on Lot 10. Pritchett and the inspector met Eugene Skinner, a sales representative of Star Homes, about half way between the houses on Lots 9 and 10. While engaged in a conversation, Larry Hughes, Jr. and his young friend, Steve Brantley, approached within twenty to thirty feet.
Skinner testified that he told the boys there was a rattlesnake in the vicinity in order to persuade them to leave. According to both Skinner and Pritchett, the boys then left proceeding between Lots 9 and 10 toward the road after being warned about the snake. The conversation between Skinner, Pritchett, and the inspector lasted about ten minutes after which Pritchett proceeded to Lot 10 to fill the field lines on Lot 10 with a backhoe. Skinner and the inspector left the premises. A few minutes after the conversation ended, Larry Hughes' mother summoned Pritchett to come to the aid of Larry. Apparently, in the brief time that elapsed from the time Larry was last seen by Skinner and Pritchett, he had returned to the septic tank, climbed in, and in attempting to get out, had pulled one of the concrete covers from its standing position. The cover fractured Larry's skull, resulting in his death later that day.
Steve Brantley testified that he and Larry approached the septic tank and Larry climbed down into the septic tank. When Larry attempted to climb out of the tank, he caught hold of the cover at the end of the septic tank causing it to fall. Steve testified that he did not get into the septic tank with Larry because he was afraid of being injured. Larry and Steve were about the same age and Larry's school records showed that he was of average intelligence. Larry had been admonished by his parents about playing around the construction site and had been injured about a month before his death when he fell through the floor joists in the house under construction on Lot 10.
In order to determine whether the court should have given the peremptory instruction requested by the defendants, we must determine the status of Larry Hughes, Jr., that is, whether he was an invitee, a licensee, or a trespasser, the duty of the defendants to Larry, and whether there was a breach of that duty. If there was no breach of the duty to Larry by the defendants, we must then determine if the facts of this case bring it within the doctrine of attractive nuisance.
The status of a person on the property of another was stated succinctly in Hoffman v. Planters Gin Co., Inc., 358 So.2d 1008, 1011 (Miss. 1978), in the following language:
As to status, an invitee is a person who goes upon the premises of another in answer to the express or implied invitation of the owner or occupant for their mutual advantage. Langford v. Mercurio, 254 Miss. 788, 183 So.2d 150 (1966); Wright v. Caffey, 239 Miss. 470, 123 So.2d 841 (1960). A licensee is one who enters upon the property of another for his own convenience, pleasure or benefit pursuant to the license or implied permission of the owner whereas a trespasser is one who enters upon another's premises without license, invitation or other right. Kelley v. Sportsmen's Speedway, Inc., 224 Miss. 632, 80 So.2d 785 (1955).
*304 A landowner owes a licensee the duty to refrain from willfully or wantonly injuring him. Astleford v. Milner Enterprises, 233 So.2d 524 (Miss. 1970); Marlon Investment Co. v. Conner, 246 Miss. 343, 149 So.2d 312 (1963); Dry v. Ford, 238 Miss. 98, 117 So.2d 456 (1960). A landowner owes a trespasser the duty to refrain from willfully or wantonly injuring him. McGee v. Charles F. Smith & Sons, Inc., 357 So.2d 930 (Miss. 1978); Ausmer v. Sliman, 336 So.2d 730 (Miss. 1976); Langford v. Mercurio, 254 Miss. 788, 183 So.2d 150 (1966); Kelley v. Sportsmen's Speedway, Inc., 224 Miss. 632, 80 So.2d 785 (1955). Larry Hughes, Jr. was a trespasser, or at most a licensee. In either status, the duty owed him by the defendants was to refrain from willfully or wantonly injuring him.
In one case, Hoffman v. Planters Gin Co., Inc., 358 So.2d 1008 (Miss. 1978), we applied the standard of ordinary and reasonable care rather than the standard of intentional or wanton negligence due a licensee. In that case we held that the owner of premises is liable for injury proximately caused by the owner's affirmative or active negligence in the operation or control of activities which subjects a licensee to unusual danger or increases the hazard to the licensee when the presence of the licensee is known. In Hoffman, we changed the standard of care owing to a licensee but carefully limited the new standard of care to those cases involving injury resulting from active conduct as distinguished from conditions of the premises, or passive negligence.
Larry Hughes, Jr. did not meet his death as a result of active conduct; therefore, the standard of care required of the defendants in this case was not to willfully or wantonly injure Larry. The evidence does not show that the defendants violated this standard.
The next question is whether the septic tank constituted an attractive nuisance. The doctrine of attractive nuisance was established in an attempt to balance two competing equities. First, society has a definite interest in protecting its children and recognizes that most children will trespass on occasion and sometimes are injured when they do so. Second, society must not place upon the owners of premises the unreasonable burden of providing a safe place in which every child may trespass under all circumstances. Harkins v. City of Carthage, 284 So.2d 530 (Miss. 1973). The doctrine of attractive nuisance was first enunciated as such by this Court[1] in the case of Lucas v. Hammond, 150 Miss. 369, 116 So. 536 (1928):
The appellant, being a trespasser, is not entitled to recover, unless the case comes within the "attractive nuisance doctrine." This doctrine has been repudiated by a majority of the courts, and "needs very careful statement not to make an unjust and impracticable requirement." United Zinc & Chemical Co. v. Britt, 258 U.S. 268, 42 S.Ct. 299, 66 L.Ed. 615, 36 A.L.R. 28. The tendency of the courts recognizing it is to limit, instead of enlarge, the scope thereof. Compare Sioux City & P.R. Co. v. Stout, 17 Wall. 657, 21 L.Ed. 745, with United Zinc & Chemical Co. v. Britt, supra, and N.Y.N.H. & H.R. Co. v. Fruchter, 260 U.S. 141, 43 S.Ct. 38, 67 L.Ed. 173. See, also, Salter v. Lbr. Co., 137 Miss. 229, 102 So. 268; McComb City v. Hayman, 124 Miss. 525, 87 So. 11; and Totty v. Lee County Gin Co. (Miss.), 110 So. 125. As enforced by this court, the doctrine may be stated as follows:
"One who maintains dangerous instrumentalities or appliances on his premises easily accessible to children and of a character likely to attract them in play, or permits dangerous conditions to remain thereon with the knowledge that children are in the habit of resorting thereto for amusement,"  and who fails to exercise ordinary care to prevent children from playing therewith or resorting thereto, is *305 liable to a child non sui juris who is injured thereby, and who did not know and appreciate the danger incurred by him in playing with the instrumentality or in the vicinity of the dangerous condition, or was too young to be charged with such knowledge. (150 Miss. at 381; 116 So. at 536, 537).
It is noted that in order for a condition of premises to constitute an attractive nuisance there must be maintained on the premises dangerous instrumentalities or appliances easily accessible to children. We have held that water hazards are not attractive nuisances, and have adopted this rule with reference to impounded water even though children are attracted to water and even though it is dangerous and they are not able to swim. Ausmer v. Sliman, 336 So.2d 730 (Miss. 1976); Gordon v. C.H.C. Corporation, 236 So.2d 733 (Miss. 1970); McGill v. City of Laurel, 252 Miss. 740, 173 So.2d 892 (1965).
In Jackson v. City of Biloxi, 272 So.2d 654, 658 (Miss. 1973), we stated the following with reference to the attractive nuisances:
In the absence of special circumstances not present here, this Court has consistently refused to apply the attractive nuisance doctrine unless the instrumentality complained of was inherently dangerous. Such instrumentalities have been held to include the following: turntables, live shells such as an unexploded anti-aircraft shell, dynamite or dynamite caps, other explosives such as fireworks, and electrical conduits. Shemper v. Cleveland, 212 Miss. 113, 54 So.2d 215 (1951); Hercules Powder Co. v. Wolf, 145 Miss. 388, 110 So. 842 (1927); McTighe v. Johnson, 114 Miss. 862, 75 So. 600 (1917); Dampf v. Yazoo & M.V.R.R., 95 Miss. 85, 48 So. 612 (1909).
Jackson summarizes our decisions on attractive nuisances holding that in the absence of special circumstances, the attractive nuisance doctrine should not be applied unless the instrumentality complained of is inherently dangerous. We are of the opinion that there was nothing inherently dangerous about the septic tank and the doctrine of attractive nuisance does not apply. Consequently, defendants were entitled to a peremptory instruction.
Some of the justices are of the opinion that the question of whether the condition of the premises constituted an attractive nuisance should have been submitted to a jury. In Paymaster Oil Co. v. Mitchell, 319 So.2d 652 (Miss. 1975), we held that juries resolve conflicts of fact but the court resolves issues of law arising from nonconflicting facts. There was no conflict in the evidence about the condition of the premises in this case. In City of Greenville v. Laury, 172 Miss. 118, 159 So. 121 (1935), we held:
In an action at law based on negligence, the question of negligence vel non is for the determination of the jury, unless the doing of the act which caused the injury complained of is not in dispute or conclusively appears from the evidence, and no inference except that of negligence or of no negligence can be justly drawn therefrom, in which event the question is for the determination of the trial judge. Whitney v. Cook, 53 Miss. 551; McCaughn v. Young, 85 Miss. 277, 37 So. 839; Farmer v. Cumberland Telephone & Telegraph Co., 86 Miss. 55, 38 So. 775. (172 Miss. at 122, 159 So. at 122).
To the same effect are the cases of Mercy Regional Medical Center v. Doiron, 348 So.2d 243 (Miss. 1977) and Supreme Instruments Corp. v. Lehr, 190 Miss. 600, 199 So. 294, Suggestion of Error Sustained 1 So.2d 242 (1941).
In view of the fact there is no conflict in the evidence about the condition of the premises, the question of whether the condition of the premises constitutes an attractive nuisance is one for the court rather than for the jury.
The minority relies on Spengler, Admr. v. Williams, 67 Miss. 1, 6 So. 613 (1889). Spengler has no application because the lumber was not piled on defendant's property but in a public street. The declaration charged that the lumber fell on the child by reason of the "careless and negligent manner in which it had been piled." The question in *306 Spengler was negligence rather than the duty owed by a property owner to a person coming on his property as an invitee, licensee or trespasser.
Having determined that defendants were entitled to a peremptory instruction, it is not necessary to note or discuss the assignments of error of the plaintiff.
AFFIRMED.
SMITH and ROBERTSON, P. JJ., and WALKER, BROOM and LEE, JJ., concur.
COFER, Justice, dissenting:
Being convinced that the appellees' liability, if any, is a question for jury decision under the record here before us, I must dissent from the majority's contrary decision.
The majority opinion includes the premise that there is no conflict in the testimony as to liability of appellees, and liability becomes a question of law for the trial judge. The opinion cites as authority Paymaster Oil Co. v. Mitchell, 319 So.2d 652 (Miss. 1975), and City of Greenville v. Laury, 172 Miss. 118, 159 So. 121 (1935). No fault is found with the legal principles announced in these decisions, but it is believed that the record presents jury issues.
That children frequented the premises of the construction for several months before the tragic occurrence involved herein was known to appellee Star Homes, Incorporated. Eugene Skinner, its secretary, building construction supervisor, and salesman, testified to childrens' usual practice of being on the premises during the erection of all of the fifteen residences in the subdivision. He testified to the injury that Larry received a month or so prior to the fatal occurrence, when he fell off a floor joist in one of the houses and this injury required stitches in his head. There is, running through all this testimony, a lively concern for the safety of the houses and their windows, and that the sand and rock would not be ruined by the children's playing.
As to approval or disapproval by defendants of children playing in the area, Skinner testified that he was called by children a "mean old man," but Steve Brantley, present when Larry met his death, being eleven years of age when testifying, said he had never heard of reference to him as "a mean old man." Skinner said he urged Steve and Larry to leave by telling them there was a rattlesnake about, but Steve said he was just joking.
The following enlightening testimony was given on cross examination of Steve:
Q. Now did you ever hear any of the children out there call Mr. Skinner, "The mean old man in the little green car?"
A. No, sir.
Q. You never heard that before?
A. No, sir.
Q. Did you ever know that Mr. Skinner tried to keep children away from the places where the houses were being built?
A. No, sir.
Q. He never got after you about that?
A. No, sir.
Q. The day that the accident happened, Mr. Skinner did have some conversation, or did talk to you and Larry there?
A. Yes, sir; but it was in a joking way.
Q. In a joking manner?
A. Yes, sir.
Q. He didn't say anything to you about not being around the construction site?
A. No, sir.
Q. He didn't say anything to ya'll like, "It's dangerous," that, "Ya'll better leave the property," or, "leave the property."
A. No, sir.
Q. And he didn't ask you to leave the property?
A. No, sir.
Q. And he didn't talk to you but just one time?
A. That's right.
In contradiction of Skinner's projected image of stern insistence that the children *307 stay away, Mrs. Judy Hughes, Larry's mother, testified as follows:
Q. Tell the jury how he acted with respect to allowing or disallowing, prohibiting the children from playing on the lots where construction activities were going on.
A. As far as allowing, there were times when I would be out in the afternoon with the children and other mothers alike, and if they went to get in the rock piles or sandpiles, or anything like that, and I would call them back, he would say, you know, that it was all right, they wouldn't hurt anything, that I was being too strict sometime, to let them roam, that that was a good area for kids.
Q. Who would say it was a good area for kids?
A. Mr. Skinner would say that general area, living outside town like that was a good area for children, but he said it wouldn't hurt for them to play in the sand and dirt or anything like that; there was always piles of dirt for kids to get into sitting around.
The concrete slab which was the lethal weapon was recognized by Skinner as being dangerous. He said, "I don't know what you said... about the septic tank being dangerous, I know it's dangerous... ." "If a child got down in a septic tank; yes, it was more dangerous." He further testified that it would have cost very little to cause the tops to be laid flat, or to have braced them on their sides, and that it probably would not have cost anything.
Mr. Skinner further testified:
Q. You are familiar with the curiosity of young boys; aren't you, Mr. Skinner, because one day you were a young boy?
A. Yeah, hu-huh.
Q. You know that children are naturally curious when it comes to construction sites and caves, and building forts, and this type of thing that interests a child, particularly, a young boy?
A. Yes, I have it all the time.
and further,
Q. You know how children are reliable and what they might or might not do from one second to the next; don't you, from your own experience?
A. Yeah.
Q. They are unpredictable, aren't they?
A. Unpredictable.
Q. They might do one thing one minute and the next minute they will be right back in what you told them to stay off of; isn't that right, sir?
A. That's right.
Q. So you expected that, didn't you?
A. I didn't expect it.
Q. Well, you knew that that was what was likely to happen because that's your experience, and that's what tells you is likely to happen; isn't that right?
A. Every time before when I run kids off, they stayed gone for a little while.
The majority opinion finds that Larry was a trespasser or, at most, a licensee, in either of which events the defendants only owed him the duty of refraining from wilfully or wantonly injuring him.
Common experience teaches that children are attracted to fresh excavation. Mr. Skinner virtually admitted this; and, having been attracted thereto, the next step in the satisfaction of curiosity is for the child to get into the excavation. Larry did both of these. His act is understandable and well within his predictability.
This Court spoke to this curiosity and others being charged with knowledge thereof in Spengler, Admr. v. Williams, 67 Miss. 1, 6 So. 613 (1889), wherein Spengler's decedent, age seven years, was killed by the falling of a stack of lumber piled by defendant in a street where the decedent and other children were wont to play. There was a judgment for the plaintiff, and on appeal, the Supreme Court said this:
All persons are supposed to know the curiosity of children, and their disposition *308 to play around and about objects of unusual appearance. No court would permit a verdict to stand which rested upon the denial of such instincts in children, or excused the negligence of the defendant because of the want of specific evidence that he possessed that common knowledge which all men are assumed to have. (67 Miss. at 4, 6 So. at 614).
In ninety years, there has been no recession from the rule in the Spengler case and it applies here and, to me, is controlling.
It is my view that appellees owed to Larry at least ordinary care, and, had this care been extended, the heavy slabs would have been laid on their flat sides or would have been braced against Larry's natural act in pulling himself upward by taking hold of one of them.
The common presence of the children on the premises known to the defendants and well known to Mr. Skinner's employer, and their lack of protest, amounting to their consent to the children's presence, made for them the duty of refraining from setting a dead-fall to catch them.[1] In this instance, Larry, who was the quarry, suffered a crushed head and died a short while later.
There were errors in the instructions, touching upon contributory negligence and imputation of negligence. I would reverse and remand the cause for new trial on all issues, including punitive damages.
PATTERSON, C.J., and BOWLING, J., join in this dissent.
NOTES
[1] Earlier cases decided on the principle of attractive nuisance without defining the doctrine are: Mackey v. City of Vicksburg, 64 Miss. 777, 2 So. 178 (1887); Spengler v. Williams, 67 Miss. 1, 6 So. 613 (1889); City of Vicksburg v. McLain, 67 Miss. 4, 6 So. 774 (1889); Temple v. McComb City Electric Light & Power Co., 89 Miss. 1, 42 So. 874 (1906); Dampf v. Yazoo & Miss. Valley RR. Co., 95 Miss. 85, 48 So. 612 (1909).
[1] A trap for wild animals made by resting a log upon a figure-four trigger, with bait on the free end of the trap's figure-four's horizontal member. When the animal undertakes to take the bait therefrom, the trap collapses causing the log to fall upon and kill or to retain the animal.