ROY NOBLE LEE, Chief Justice,
for the Court:
E.A. Lumbley and Lora Lumbley, husband and wife, filed suit in the Circuit Court of the First Judicial District, Hinds County, Mississippi, seeking damages for personal injuries sustained by Lora Lumb-ley when she fell through a stairway railing at the caretaker’s residence on Ten Point Hunting Club’s property, against the Ten Point Company and Harry D. Osborne, President of said company. E.A. Lumbley, the husband and club’s caretaker, sought damages for loss of consortium. The lower court entered an order granting summary judgment in favor of the Ten Point Company and Osborne, and the Lumbleys have appealed here, assigning four (4) errors in the trial below.

Facts

Ten Point is a Mississippi corporation organized on October 4, 1965, for the purpose of owning and operating a “members only” hunting and fishing club. The majority of its members live in Jackson. The club is located in a remote area of Issaque-na County on land owned by Anderson-Tully Co. and leased by Ten Point.
At the campsite is a dining hall, pump house, skinning shed, cooler, trailers, cabin, and a caretaker’s house. Ten Point employs a caretaker to look after the property. Between 1974 and 1976 the club moved a house onto the property to serve as the caretaker’s residence. The house sits fifteen (15) to twenty (20) feet off the ground on wooden poles. There are two sets of stairs, which provide access to the house. The stairs involved in this litigation were built in 1984 of treated lumber and are frequently used to access the house. They rise approximately four feet from the ground to a landing at which point the stairs take a ninety degree turn and ascend upward to a doorway situated at the end of the house.
In June or July of 1986 Ten Point’s caretaker left and the club was searching for a caretaker after the job became vacant. E.A. Lumbley heard ábout the job and approached James Carroll, Vice-President of Ten Point, for employment. On July 27, 1986, Carroll hired Lumbley. Ordinarily the President, Harry Osborne would handle such matters, but he was out of town at the time. There was some sense of urgency to get a caretaker quickly because Carroll had received reports from a game warden in Issaquena County and the Warren County Sherriff’s Department that one of the camps nearby was burglarized.
At the time Lumbley was hired, he and his wife Lora were separated. Lora was living with, and taking care of, Ethel P. Wessinger who lived in Cary, Mississippi, about 30 miles north of Vicksburg. Lumb-ley told Carroll that Lora had left him and that he was trying to get her back. Lumb-ley was 65 years old and had a fourth (4th) grade education. Because he had never been a caretaker before, Lumbley request *1028 ed a list of duties that he was expected to perform. Osborne upon his return, provided him with the following list of duties:
1) keep out trespassers;
2) cut grass and pick up limbs;
3) maintain water well;
4) upon conclusion of the hunting season, wash and clean meat cooler and skinning racks;
5) store scales and other tools utilized in dressing deer in mess hall storage cabinet.
In addition, his duties were general about the camp.
In consideration for his services, Lumb-ley was given use of the caretaker’s residence and was paid a monthly salary plus part of the electrical bill on the house. Previously, the caretaker had always paid the phone bill except for long distance calls by the members. However, Lumbley had trouble with the phone company and he couldn’t get the service in his own name. Ten Point decided that it needed a phone at the camp and agreed to pay the regular monthly charges with Lumbley paying for personal long distance calls.
Lumbley moved into the caretaker’s house on or about July 27, 1986. Prior to moving, he observed that the house was in need of several repairs. Specifically, he requested, and was given, authorization to perform the following repairs:
1) repair water lines
2) repair hot water heater
3) replace water faucets in kitchen and bathroom
4) repair walls in bathroom
5) paint kitchen
6) replace hinges on cabinets in kitchen.
Around August 1, Lumbley and wife reconciled their differences and Lora decided she would again live with him after she gave one month’s notice to Ms. Wessinger. On September 4, 1986, Lora moved into the caretaker’s residence with Lumbley. Mr. Carroll stated in his deposition that he first learned that Lora was living with Lumbley when the members had a workday in September and stated that it didn’t matter to him one way or the other that she was there. Lumbley was hired to do the caretaker’s job but Carroll was glad to get Lora’s input.
On September 30, Lora was recovering from a fracture to her ankle, which was in a cast. The doctor had told her that the cast was not made for walking and that she should not walk on it. Nevertheless, she walked down the stairs to the landing and leaned over the rail to hand her husband something. The part of the landing over which she leaned did not have a top rail, as did both sides of the landing at the top of the stairs and the other side of that same lower landing. However, it did have a rail about one-third (⅛) of the way down from the top of the vertical sideposts.
When Lora leaned over the rail to hand the item to Lumbley, the board rail gave way and she fell about four feet onto a concrete surface. An ambulance transported Lora to Kuhn Memorial Hospital near Vicksburg. However, the hospital did not have the facilities for the operation she needed and Lora was taken to Mercy Regional Medical Center where she spent 28 days and was treated for broken bones and multiple injuries. Lora’s hospital stay required Lumbley to be at the hospital quite a bit and he was unable to perform his duties as caretaker.
There was much deposition testimony given with regard to the condition of the rail and the knowledge which Lumbley and Ten Point had of it. Lumbley stated that the rail was a one-by-four (1" x 4") which was nailed on the outside of the sideposts of the landing with three little nails. Apparently rain had seeped behind the board and caused the nail holes to rot. Lumbley testified that the rotted condition of the nail holes couldn’t have been discovered unless the board was taken off and looked at. The whole board was not rotten; to fix it would only require some larger nails. Lora Lumbley stated that the stairs and rails looked to be in good condition. She held onto the rails as she went up and down the stairs but she didn’t hold onto the rails when she was on the flat surface of the landing. She stated that with the naked eye, you couldn’t see anything that *1029 was wrong with the rail. James Carroll testified that while he was president, which was about a year and a half prior to the accident, he regularly shook the specific railing and all railings to make sure they were safe.
In early December Harry Osborne gave Lumbley notice that he was being terminated. Osborne told Lumbley that they would pay him for December and he could have until the end of that month to find somewhere else to live. On June 5, 1987, Lora Lumbley filed a complaint in the First Judicial District of Hinds County seeking recovery of $20,913.24 in medical expenses and $500,000 damages for permanent injuries she sustained in the fall. Lumbley joined in the suit seeking $50,000 for loss of consortium. On September 9, 1987, the Appel-lees filed a Motion to Dismiss, or in the alternative, for Summary Judgment. In support of their motion the Appellees submitted portions of the depositions of Lora Lumbley, E.A. Lumbley, Harry Osborne and Jim Carroll. In opposition to the motion the Lumbleys also submitted portions of the depositions as well as an affidavit from Lumbley. The trial judge heard oral argument on the motion and each party submitted briefs. The Court in an Order dated October 30, 1987, granted the appel-lees’ motion for summary judgment.

Law

The court order granting appellees’ motion for summary judgment stated:
[T]he Court, having heard oral argument and reviewed the briefs of counsel as requested by the Court, considered same and being fully advised in the premises find [sic] that on the date of the subject accident, the Plaintiff, Lora Lumbley, occupied the status of a licensee on the Defendant’s premises, there being no genuine issue of material fact in that regard; and, that there was no allegation and no proof before the Court that the Defendants acted in any manner consistent with a breach of any duty owed to a licensee.... [T]he Motion to Dismiss or in the Alternative, the Summary Judgment of the Defendants, Harry Osborne and The Ten Point Company, Inc., be and the same is hereby granted, there being no genuine issues of material fact as set forth above.
The four assigned errors of the appellants will be consolidated so as to present two issues:
I.
THE LOWER COURT ERRED IN DETERMINING THAT APPELLANT LORA LUMBLEY OCCUPIED THE STATUS OF A LICENSEE ON THE AP-PELLEES’ PREMISES.
THE LOWER COURT ERRED IN RULING THAT THERE WAS NO ALLEGATION AND NO PROOF BEFORE THE COURT THAT THE APPELLEES ACTED IN ANY MANNER CONSISTENT WITH THE BREACH OF ANY DUTY OWED TO APPELLANTS.
A.

Was appellant Lora Lumbley a licensee or invitee?

The answer to this question determines the standard of care required of the Ten Point Club in the operation, management and care of its property. In Lucas v. Miss. Housing Authority No. 8, 441 So.2d 101 (Miss.1983), this Court stated the standard of care as applied to an invitee and a licensee. The Court said:
[A]n invitee is a person who goes upon the premises of another in answer to the express or implied invitation of the owner or occupant for their mutual advantage. A licensee is one who enters upon the property of another for his own convenience, pleasure or benefit, pursuant to the license or implied permission of the owner. Hoffman v. Planters Gin Co. Inc., 358 So.2d 1008 (Miss.1978).
441 So.2d at 103.
A property owner only owes the licensee a duty to refrain from wilfully or wantonly injuring him. That duty is the same as owed a trespasser. On the other *1030 hand, a landowner owes a business invitee the duty to exercise reasonable care not to injure him. Lucas v. Buddy Jones Ford, 518 So.2d 646 (Miss.1988); Hughes v. Star Homes, Inc., 379 So.2d 301 (Miss.1980).
In the case sub judice, the caretaker’s residence was constructed for the benefit of Ten Point and its caretaker. Without question, it was contemplated that a caretaker with a wife and/or family would be provided a place to live and that provision was a' consideration or inducement for a caretaker to accept the position. The record indicates that Ten Point considered a caretaker’s wife as an asset to the club in that she would notice things and make suggestions to her husband caretaker concerning his duties and employment. In Lucas v. Miss. Housing Authority No. 8, 441 So.2d 101 (Miss.1983), which involved the death of a six-year-old guest of a tenant’s child, who was the same age, and whether the guest enjoyed the status of invitee or licensee, the Court said:
The swimming pool at the apartment complex had been constructed and was maintained for the benefit of the tenants in the complex, and it reasonably follows that the pool was for the mutual benefit of the appellee and its tenants, and that a part of the rental or consideration for occupying the apartments was the inducement, pleasure and benefit of the swimming pool to the tenants. Appellee permitted the tenants to invite guests to the complex for the purpose of swimming in the pool. The swimming pool, therefore, was a common area of the complex used by the tenant families and their invited guests. It would be unconscionable to establish a principle of law that appellee owed to the six-year-old child of a tenant the duty to use reasonable care not to injure him and, yet, owed to his six-year-old invited guest, swimming in the same pool, only the duty not to willfully or wantonly injure him.
441 So.2d at 103.
The invitee status of the six-year-old guest drowning victim arose from the tenant’s rental agreement with the apartment complex. We think the situation and status of appellant Lora Lumbley here is analogous to that of the guest in Miss. Housing Authority No. 8.
We hold that the status of appellee Lora Lumbley was the same as that of her husband, with whom she lived and shared the house of Ten Point, i.e., invitee.
B.

Did Ten Point breach a duty, and was it liable, to appellant Lora Lumbley?

 The principle of law upon which liability of Ten Point may be based is whether Ten Point knew, or in the exercise of reasonable care, should have known, the defective condition of the rail and that it constituted a danger and hazard to persons using the stairway. The evidence before the lower court was undisputed and overwhelming that neither Ten Point and its officials nor the appellants knew, or in the exercise of ordinary and reasonable care, should have discovered the defect. The condition of the rail was a latent defect and, to discover it, the stairway would have had to be dismantled and taken apart. Appellant E.A. Lumbley testified as follows:
Q. And you wouldn’t let a dangerous situation exist on the camp house, if you knew about it, would you?
A. If I knew about it.
Q. And you used that camp house more than anybody else don’t you?
A. Right.
Q. And you were there on a day to day basis, weren’t you?
A. Day to day basis.
Q. And specifically, had you known the condition of this rail which you heard your wife testify, you would not have allowed it to exist if it was in such a condition, would you?
A. Right.
Q. You would have fixed it, wouldn’t you?
A. I would have gotten permission to fix it, yes.
******
Q. So, you’re not saying it (the rail or post) was rotten and falling apart?
*1031 A. The only rotten part is where the nail went into the post. It rained down behind this 1x4, rotted the nail hole, which you could not see visually until it was off; and the rail came off.
⅝ ⅝ ⅜ ⅝ SfS ⅜
Q. Okay, now, and it’s your opinion that it could have been corrected by putting bigger nails in the same place?
A. Right.
Q. So, it wasn’t so rotten that bigger nails couldn’t fix it?
A. Right.
Q. And the only way that you could have possibly have discovered that condition was to take that board off and look at it?
A. That’s the only way I could have.
Appellant Lora Lumbley testified with reference to the condition of the stairway and rail as follows:
Q. What about any of the stair rails or the stairs?
A. Well, they looked good. They looked like they were substantial.
Q. What do you mean by “substantial”?
A. Looked like they would hold anybody.
Q. Now tell me specifically what you are talking about when you say “they”?
A. Talking about the stairs, the rail, and everything. It did look good.
Q. And you say they looked good, and you are talking about those stairs on the east side?
A. I am talking about the ones on the east side. They looked real — in good condition.
Q. The stairs and the rails themselves?
A. Right
We state again that an owner of property is liable to an invitee for those hidden or latent defects which are known to the owner in the exercise of reasonable care. The appellants were in a better situation to discover and know of the defective rail than were the appellees. We are of the opinion that there was no genuine issue of fact to make a question of liability and that the lower court did not err in granting the summary judgment. Diamond Intern. Corp. v. May, 445 So.2d 832, 835 (Miss.1984); Downs v. Corder, 377 So.2d 603, 604-605 (Miss.1979); Braswell v. Economy Supply Co., 281 So.2d 669, 677 (Miss.1973); 62 Am.Jur.2d Premises Liability § 68 (1972); Restatement (Second) Torts § 343 (1965).
We find no merit in the other arguments of the appellants. Therefore, the judgment of the lower court is affirmed.
AFFIRMED.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.