# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-00921-SCT

*MILTON TITUS, JR, LUCY TITUS, LUCY PATRICIA TITUS, CHRISTOPHER TITUS, STEPHANIE TITUS AND RENEE TITUS, THE WRONGFUL DEATH HEIRS AND BENEFICIARIES OF MILTON TITUS, III, DECEASED*

*v.*

*RICHARD DON WILLIAMS AND THE FLASH STORE, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/7/2001 |
| TRIAL JUDGE: | HON. ANDREW C. BAKER |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | CARROLL RHODES |
| | NATHANIEL ALANDAS ARMISTAD |
| ATTORNEYS FOR APPELLEES: | HOLLY STUBBLEFIELD MATHEWS |
| | JOHN S. HILL |
| | STEFFANIE ANNE GRAVES |
| | JAMES P. STREETMAN, III |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 05/01/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH
## NO. 2001-CA-01653-SCT

*MILTON TITUS, JR., LUCY TITUS, LUCY PATRICIA TITUS, CHRISTOPHER TITUS, STEPHANIE TITUS AND RENEE TITUS, THE WRONGFUL DEATH HEIRS AND BENEFICIARIES OF MILTON TITUS, III, DECEASED*

*v.*

*THE TOWN OF SARDIS, MISSISSIPPI*

DATE OF JUDGMENT:                    10/1/2001
TRIAL JUDGE:                         HON. ANDREW C. BAKER
COURT FROM WHICH APPEALED:           PANOLA COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:            CARROLL RHODES
                                     NATHANIEL ALANDAS ARMISTAD

ATTORNEYS FOR APPELLEE:              WILTON V. BYARS, JR.
                                     MITCHELL ORVIS DRISKELL

NATURE OF THE CASE:                  CIVIL - PERSONAL INJURY
DISPOSITION:                         AFFIRMED - 05/01/2003
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE SMITH, P.J., DIAZ AND COBB, JJ.**

**DIAZ, JUSTICE, FOR THE COURT:**

¶1.     Plaintiffs Milton Titus, Jr., Lucy Titus, Lucy Patricia Titus, Christopher Titus, Stephanie Titus, and Renee Titus filed suit in the Circuit Court of the First Judicial District of Panola County against Richard Don Williams (Williams), The Flash Store, Inc. (Flash Store)[1], and the Town of Sardis, Mississippi, seeking damages for the wrongful death of Milton Titus, III (Titus), who was killed by a third party on the Flash Store's property. Plaintiffs alleged that negligence and gross negligence committed by the defendants were a proximate cause of Titus's death.

¶2.     Williams filed a motion for summary judgment on the basis that, as an absentee landlord, he owed no duty to Titus and had committed no form of negligence. The Flash Store filed a motion for summary judgment on the basis that Titus was a trespasser or at best a licensee on its premises and it did not violate its duty to refrain from willfully or wantonly injuring him. The Town of Sardis filed a motion for summary judgment on the basis that, as a governmental entity, Sardis is exempt from liability for the performance of

---

[1]On April 16, 1999, by an agreed order of the parties, the circuit court substituted the Flash Store, Inc. as a defendant in the place of original defendant Fakhri H. Safi (known as "Fred"), the manager of the Flash Store.

police duties unless its employee(s) acted in reckless disregard of the safety and well-being of any person not engaged in a criminal activity at the time the injury occurred. The circuit court granted summary judgment in favor of all defendants.

¶3. The circuit court denied an interlocutory appeal, and final judgment was entered. Plaintiffs filed a timely appeal.

## FACTS

¶4. The Flash Store is a convenience store located at the corner of U.S. Highway 51 and Mississippi Highway 315 in Sardis, Mississippi. The property and store have been owned by Williams since October 19, 1994. Williams, who lives in Hinds County, has only visited the property twice since purchasing it. Thus, he is considered an absentee landlord. Williams has leased the store to different corporations or persons in the past, but the store became the Flash Store on April 28, 1995, through an assignment of a previous lease held by Jr. Food Mart. (The Flash Store, Inc., was the owner of the Flash Store at the time the incident in question occurred.)

¶5. The area in which the Flash Store is located is considered undesirable. The parking lot had become an area where local crowds of young people gathered during the weekends and holidays. Jr. Food Mart employed a security officer when it occupied the building. The Flash Store had no security personnel. According to the plaintiffs, scuffles, fights, drug-deals and other inappropriate and illegal activity often occurred there.

¶6. On January 10, 1998, around 9:00 p.m., a crowd of twenty-five or more people had gathered in and around the Flash Store parking lot. Two people from the crowd, Eric Kelson (Eric) and Montriel Butcher (Butcher), began to argue over the fact that Eric's girlfriend was looking at Butcher. Tywon "Spanky" Kelson (Tywon), Eric's nephew, and Titus, drove up and saw this argument. Tywon and Titus

3

attempted to break up the argument. Butcher informed Titus that the argument was none of his concern and to stay out of it. Titus responded that Eric was one of his friends and that he did consider it his business.

¶7.     Meanwhile, Fred, instructed his employee, Angela Roberson (Angela), to tell everyone to clear the parking lot because he had just called the police. The time was 9:16 p.m. The majority of the people left the premises. Eric left with parties unknown, and Butcher left with his brother, Kirby "Boogie" Butcher, in Kirby's[2] car.

¶8.     At 9:18 p.m., two minutes after receiving the call from Safi, Sardis police officers arrived at the Flash Store. The officers investigated the incident and dispersed what remained of the crowd. Walter Wheatley (Wheatley), there to pick up his girlfriend, Angela, remained in the parking lot. The Butcher brothers were no longer at the scene when the officers arrived. Titus and Tywon told the officers that nothing was going on and that they had not been fighting. They did not ask for any special protection from the officers nor give the officers any reason to believe that they were in danger. Tywon and Titus left in Tywon's car. No formal complaints were filed, and no one was arrested.

¶9.     According to Wheatley, about forty minutes after this first altercation, the Butcher brothers returned to the store to get gas for their car. Tywon testified that he and Titus spotted Kirby's car at the Flash Store gas pumps and decided they wanted to get the license plate number for the police because a man named Avery Dillard told Tywon and Titus that Butcher "had a gun and [they] better watch themselves." Tywon pulled onto the parking lot to get the tag number. Butcher saw them and retrieved a "long gun" from

---

[2]Throughout the remainder of this opinion, Montriel Butcher will be referred to simply as "Butcher," when both Butcher brothers are mentioned, they will be referred to as the "Butcher brothers."

4

his brother's car. Tywon quickly made a U-turn. Butcher fired two shots at the car, striking the rim of the right front tire.

¶10.     Meanwhile, Angela, Fred, and an employee known only by the name of "Al" were inside the Flash Store. Fred claims he neither saw nor heard any gunshots, while Angela claims she saw the flash from the gun, but did not hear anything. A couple of minutes later Wheatley came in and informed them that Butcher had just shot at Tywon and Titus. Angela stated that she knew that Butcher had a bad reputation and was "in and out of trouble" all the time. Angela and Walter told Fred that he needed to phone the police before someone got hurt. Plaintiffs allege that Wheatley also urged Fred to close the store, but Fred refused, telling them that "nothing is going to happen." Fred did not call the police to report the shooting.

¶11.     At 9:57 p.m., Titus and Tywon arrived at the Sardis Police Department to report the shooting. Officers listened to their complaint, asked them questions and inspected their vehicle. A BOLO bulletin[3] with a description of Kirby Butcher's car was put out on the state-wide radio. Titus and Tywon told the officers that the Butcher brothers had already left the Flash Store. The officers, fearing that Titus and Tywon would seek revenge, tried to calm the two men down. They explicitly and repeatedly told Tywon and Titus to stay away from the Flash Store and to let the police handle the situation. Tywon and Titus left the station and went riding again.

¶12.     Minutes after leaving the Sardis Police Station, Tywon and Titus were at a four-way stop at the intersection of Highways 51 and 315, in front of the Flash Store. The Butcher brothers were inside the store paying for the gas they were getting and apologizing to Fred for "disrespecting his parking lot" by shooting a gun. Fred did not call the police to report that the Butcher brothers had returned.

---

[3]A "BOLO" is a statewide dispatch informing law enforcement officers to "be on the look-out" for the subject vehicle. In this instance, the BOLO went to the following units in the area: the Miss. Highway Patrol, Panola County Sheriff's Department and local police departments.

¶13.    Back at the four-way stop, Titus stated to Tywon something to the effect of "there they are, let's get them." Tywon allegedly suggested that Titus leave the matter to the police, but this did not discourage Titus, who exited the car and ran to the Flash Store. Tywon stayed in his parked car on the street. Titus entered the store where Angela stated he exclaimed, "You punk m[expletive]f[expletive]s shoot me now." Titus fought with both Butcher brothers. Titus supposedly got the best of the brothers, knocked them to the ground and left the store running. Butcher got up from the floor, ran to his brother's car, got the gun, and followed Titus, who had run behind the building. Butcher shot twice, hitting and fatally wounding Titus. The people in the store stated that they saw Butcher get his gun and run after Titus, but did not know about the shooting until a woman from next door came and informed them that someone had just been shot behind the store.

¶14.    At 10:10 p.m., thirteen minutes after Tywon and Titus had arrived at the Sardis Police Station to report the first shooting, the Sardis Police Department received a call from the Flash Store reporting that Titus had been shot. Officers Pride, Chitwood, Pruitt and Davis, already en route to the store, responded to the call. As they neared the store, Officers Pride and Pruitt noticed a vehicle leaving the scene at a high rate of speed. They pursued and stopped this vehicle which was driven by Tywon. After explaining what happened, Tywon got in the back seat of the squad car, and Officers Davis and Chitwood proceeded to the store. Officers Pride and Pruitt arrived shortly thereafter. Officer Davis immediately located Titus behind the Flash Store. He performed CPR; however, Titus did not respond. The police radio log reflects an emergency response request from the officers on the scene at 10:15 p.m. Titus died at the scene.

¶15.    The plaintiffs brought suit individually and as the wrongful death heirs and beneficiaries of Titus. They allege that the Town of Sardis acted in reckless disregard by failing to promptly investigate and respond to calls from the Flash Store and the complaint made by Titus and Tywon. They also made

allegations against Williams, the owner of the property where the Flash Store is located, and the Flash Store itself. All three defendants were granted summary judgment in their favor.

## DISCUSSION

¶16.   The standard for reviewing the granting or the denying of summary judgment is the same standard as is employed by the trial court under M.R.C.P. 56(c). This Court conducts de novo review of orders granting or denying summary judgment and examines all the evidentiary matters before it--admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If, in this view, the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise, the motion should be denied. Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite. In addition, the burden of demonstrating that no genuine issue of fact exits is on the moving party. That is, the non-movant would be given the benefit of the doubt. ***McCullough v. Cook***, 679 So.2d 627, 630 (Miss. 1996) (collecting authorities).

> **I.    WHETHER THIS COURT SHOULD ABOLISH THE DISTINCTIONS OF INVITEE, LICENSEE, AND TRESPASSER, IN DETERMINING THE STATUS OF A PERSON SERIOUSLY INJURED OR KILLED IN A PREMISES LIABILITY ACTION.**

¶17.   Mississippi follows the practice of classifying a person who enters the land of another as an invitee, licensee, or a trespasser in order to establish what duty, if any, the landowner or landlord owes a person who is injured on the premises. *See **Hudson v. Courtesy Motors, Inc.***, 794 So.2d 999, 1003 (Miss. 2001). Plaintiffs urge the Court to abolish these distinctions when deciding a premises liability action. They contend the classifications should be replaced with a reasonable person standard. They argue that the

7

owner or operator of the premises had actual or at least constructive knowledge of Butcher's violent nature and of the Flash Store's "atmosphere of violence." Thus, they conclude, a reasonable person would have taken measures to protect the public from these dangers.

¶18.    The defendants, on the other hand, assert that the Court has always placed a status on persons entering onto someone else's land in order to determine liability of the landowner or operator of a business. They urge us to retain these time-tested classifications.

¶19.    This Court recently declined an invitation such as that urged by plaintiffs. *See **Pinnell v. Bates***, 838 So.2d 198 (Miss. 2002). In ***Pinnell***, we stated: "There is no compelling reason to change our time-honored law on premises liability now. The distinctions between licensee and invitee have been developed over many years and are grounded in reality." ***Id.*** at 199. This reasoning remains persuasive. We again decline to abandon the invitee, licensee, and trespasser distinctions.

¶20.    This assignment is without merit.

> **II.    IF THE DISTINCTIONS OF INVITEE, LICENSEE, AND TRESPASSER ARE RETAINED, WHETHER AN EXCEPTION SHOULD BE MADE WHEN DETERMINING THE STATUS OF A PERSON SERIOUSLY INJURED OR KILLED IF THE LANDOWNER OR LANDLORD HAS ACTUAL OR CONSTRUCTIVE KNOWLEDGE THAT AN ATMOSPHERE OF VIOLENCE EXISTS ON THE PREMISES.**

¶21.    Plaintiffs argue that the Flash Store's and Williams's actual and/or constructive knowledge that an atmosphere of violence existed on the premises constituted active or affirmative negligence. They cite ***Hoffman v. Planter's Gin Co.,*** 358 So.2d 1008 (Miss. 1978), where this Court found that the licensee/invitee distinction did not apply in cases of active or affirmative negligence.

¶22.    In ***Hoffman***, we applied the standard of ordinary and reasonable care rather than the standard of intentional or wanton negligence due a licensee. We held that the owner of premises is liable for injury

8

proximately caused by the owner's affirmative or active negligence in the operation or control of activities which subjects a licensee to unusual danger or increases the hazard to the licensee when the presence of the licensee is known. We changed the standard of care owed to a licensee, but carefully limited the new standard of care to those cases involving injury resulting from active conduct as distinguished from conditions of the premises, or passive negligence. *Hughes v. Star Homes, Inc.*, 379 So.2d 301, 304 (Miss.1980). We conclude that the facts presented in this case do not support application of the *Hoffman* exception to any of the defendants.

¶23. First, the record is devoid of any evidence that Williams engaged in affirmative or active negligence in the operation or control of the business. There is no proof that Williams, the absentee landlord, was aware of Titus's presence upon the premises. Williams had no contractual duty to make repairs to the property. He did not occupy, exercise control over, or frequent the premises in question. When parties fail to allocate responsibility for keeping a leased premises in a safe condition through contract, Mississippi common law places that duty squarely on the party who possesses or controls the property. *Wilson v. Allday*, 487 So. 2d 793, 796 (Miss. 1986). The Flash Store, not Williams, operated and controlled the convenience store. Therefore, liability, if any, attaches to the Flash Store rather than Williams. *See Wilson*, 487 So. 2d at 796 ("[L]iability runs with possession and control of the property.").

¶24. Plaintiffs allege that "an atmosphere of violence" existed on the Flash Store premises and that the owner knew this and did nothing to make the store safer. They point to the fact that the previous lessee, Junior Food Mart, employed a security guard, while the Flash Store did not. They also allege that Wheatley urged Fred to close the store after the first shooting and that Fred replied, "Oh, ain't nothing going to happen." Fred did not call the police to report the first shooting, and he did not call the police when

9

the Butcher brothers returned to the store. Plaintiffss argue that allowing the Butcher brothers back onto the premises is further proof of the Flash Store's affirmative or active negligence.

¶25. Under the *Hoffman* test, the negligence of the defendant must have been the proximate cause of the plaintiff's injury. *Hughes*, 379 So.2d at 304. Proximate cause is defined as the "cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury and without which the result would not have occurred." *Delahoussaye v. Mary Mahoney's, Inc.*, 783 So.2d 666, 671 (Miss. 2001). "[N]egligence which merely furnishes the condition or occasion upon which injuries are received, but does not put in motion the agency by or through which the injuries are inflicted, is not the proximate cause thereof." *Newell v. Southern Jitney Jungle Co.*, 830 So.2d 621, 623 (Miss. 2002) (citing *Miss. City Lines v. Bullock*, 194 Miss. 630, 13 So.2d 34, 36 (1943)).

¶26. We conclude that plaintiffs failed to establish that Titus's tragic death was proximately caused by any negligence of the Flash Store and or Williams. Rather, the actions of Titus, in confronting a dangerous person, known by Titus to possess a gun which he was not afraid to use, was an intervening cause which relieved the defendants of their alleged liability. Although there is evidence supporting the conclusion that Williams and the Flash Store knew of and allowed an "atmosphere of violence" to exist at the Flash Store, the fact remains that Titus, not Williams or the Flash Store, created and caused this unfortunate event. While we must not shield property owners from their own negligence, we also must not subject them to liability for the criminal acts of their patrons when these criminal actors, so acting, cause harm to themselves.

¶27. In *Hughes v. Star Homes, Inc.*, 379 So. 2d at 304, we held that the *Hoffman* exception has no application where the licensee is injured as a result of the condition of the premises, or passive negligence. Passive negligence is defined as "the failure to do something that should have been done." Black's Law Dictionary 718 (6th ed. 1991). Active and passive negligence are distinguished as follows:

10

> One is only passively negligent if he merely fails to act in fulfillment of duty of care which law imposes upon him, while one is actively negligent if he participates in some manner in conduct or omission which caused injury.

*Id.* There is no allegation of any intentional or willful act or acts by either Williams or the Flash Store. The plaintiffs allege that the defendants, knowing of Butcher's potential dangerousness, failed to take sufficient precautions to protect Titus. We conclude that all the allegations brought by the plaintiffs involve things that the Flash Store (and Williams) failed to do. They are complaints of the Flash Store's inaction, rather than its actions. Thus, any negligence by the Flash Store was passive at most, and thus cannot not fall within the ***Hoffman*** exception.

¶28.    Absent an exception, the analysis of premises liability involves three steps, described in ***Little ex rel. Little v. Bell***, 719 So.2d 757 (Miss. 1998). This procedure involves first determining the status of the injured person as either invitee, licensee, or trespasser. After this is done, the next step is to assess, based on the injured party's status, what duty the landowner/business operator owes to them. The last step is to determine whether the landowner/business operator breached the duty owed to the injured party. ***Id***. at 760.

¶29.    A person is considered an invitee if they enter the premises of another in answer to the express or implied invitation of the owner or occupant for their mutual advantage. ***Gatewood v. Sampson***, 812 So.2d 212, 220 (Miss. 2002). A landowner owes an invitee the duty to keep the premises reasonably safe and when not reasonably safe to warn only where there is hidden danger or peril that is not in plain and open view. ***Caruso v. Picayune Pizza Hut, Inc.***, 598 So.2d 770, 773 (Miss. 1992).

¶30.    A licensee enters upon the property of another for his own convenience, pleasure or benefit pursuant to the license or implied permission of the owner. ***Hudson,*** 794 So.2d at 1003.

¶31. A trespasser is a person who enters on the property of another without any right, lawful authority, or express or implied invitation, permission, or license, not in the performance of any duty to the owner or person in charge or on any business of such person, but merely for his own purposes, pleasure, or convenience, or out of curiosity, and without any enticement, allurement, inducement, or express or implied assurance of safety from the owner or person in charge. *White v. Miss. Power & Light Co.*, 196 So.2d 343, 349 (Miss. 1967).

¶32. A landowner owes a licensee and a trespasser the same duty, to refrain from willfully or wantonly injuring him. *Adams v. Fred's Dollar Store of Batesville*, 497 So.2d 1097, 1100 (Miss. 1986) (collecting authorities).

¶33. The trial court found that, although perhaps initially a licensee, Titus became a trespasser on the Flash Store property when he returned intent upon fighting with the Butcher brothers. Although we agree with this reasoning, Titus' status in this case is irrelevant to our decision. As discussed, the ***highest*** standard of care that would be owed to anyone who comes onto someone else's land in Mississippi is to keep the premises reasonably safe ***and when not reasonably safe to warn only where there is hidden danger or peril that is not plain and in open view***. It is a general rule of law that the duty to warn disappears entirely when it is shown that the injured person did, in fact, observe and fully appreciate the peril. *Ill. Cent. R.R. v. Crawford*, 244 Miss. 300, 315, 143 So.2d 427, 431 (1962) (collecting authorities).

¶34. In this case, Titus knew of the possible danger of confronting Butcher, who had shot at him only moments before. Thus, Titus's status as invitee, licensee, or trespasser is irrelevant because the owner of

12

the Flash Store owed no duty to warn him of a situation which he created himself and the danger of which he was well aware. This being the case, we conclude that no duty was breached by the Flash Store.

¶35. This assignment is without merit.

> **III.  WHETHER THERE IS A GENUINE ISSUE OF FACT AS TO WHETHER THE POLICE OFFICERS OF THE TOWN OF SARDIS, MISSISSIPPI DEMONSTRATED A RECKLESS DISREGARD FOR THE SAFETY AND WELFARE OF TITUS AND THE GENERAL PUBLIC.**

¶36. Next, plaintiffs contend that there was a genuine issue of material of fact as to whether the police officers of the town of Sardis showed a reckless disregard for the safety of Titus and the general public on the night Titus was killed. Basically, their argument is that the Sardis Police did not respond to the report of the first shooting promptly or adequately enough to prevent the second shooting when Titus was killed. We disagree.

¶37. The Mississippi Tort Claims Act, Miss. Code Ann. §§ 11-46-1 to -23 (Rev. 2002), provides the exclusive civil tort remedy against a governmental entity, and a government is exempt from liability for the performance of police duties unless the employee(s) acted "in reckless disregard for the safety and well-being" of the plaintiff." Miss. Code Ann. § 11-46-7(1); 11-46-9(1)(c). The plaintiff has the burden of proving "reckless disregard" by a preponderance of the evidence. *Simpson v. City of Pickens*, 761 So. 2d 855, 859 (Miss. 2000).

¶38. In the context of § 11-46-9(1)(c) "reckless disregard" encompasses willful and wanton action. *Turner v. City of Ruleville*, 735 So.2d 226, 230 (Miss. 1999). Willful and wanton action signifies "knowingly and intentionally" doing a thing or wrongful act. *Little*, 719 So.2d at 761. We have further defined reckless disregard as "conscious indifference to consequences, amounting almost to a willingness

13

that harm should follow." *Maye v. Pearl River County*, 758 So. 2d 391, 394 (Miss. 1999). Thus, in order to avoid summary judgment, plaintiffs must have created a material dispute as to whether the Sardis police officers took action that they knew would result or intended to result in injury to Titus.

¶39. Plaintiffs allege that the Sardis Police acted with reckless disregard by failing to promptly investigate the shooting of Tywon's vehicle and by failing to promptly make arrests in response to the complaints made by Titus and Tywon. The undisputed facts and all the reasonable inferences flowing therefrom do not support either allegation.

¶40. At 9:16 p.m., the Sardis Police received a call reporting the first altercation in the Flash Store parking lot. Sardis Police arrived on the scene two minutes later, at 9:18 p.m. Knowing that police were on the way, most of the crowd had dispersed when they arrived. The officers investigated the incident by interviewing those that remained. Tywon and Titus were asked about the fight. They did not assist the investigation, telling officers that nothing was going on. They did not appear worried about the incident or fearful of future conflict. Neither them or anyone else present identified Butcher, who had left the scene before the police arrived. This quick response and thorough investigation indicates that the Sardis Police acted properly during the first event of the evening. We cannot find them in error for failing to discover Butcher's identity and criminal intent when this information was withheld by Titus.

¶41. At 9:57 p.m., Tywon and Titus arrived at the Sardis Police station to report that Butcher shot at their vehicle. A shift change was scheduled that night for 10:00 p.m. When Tywon and Titus came into the station, Officer Zabe Davis was coming onto his shift. He talked with Tywon and Titus and gathered the facts. He went outside and inspected their vehicle and put out a BOLO (be on the lookout) bulletin for the Butcher vehicle. Titus and Tywon informed the Sardis Police that the Butcher brothers had already left

14

the Flash Store. Sardis Police officers specifically and repeatedly instructed Tywon and Titus to stay away from the Flash Store; however, Titus and Tywon disregarded this instruction and immediately returned to the vicinity of the Flash Store. Despite urging from Tywon to leave the issue to the police, Titus entered the Flash Store intent on assaulting the Butcher brothers.

¶42. The plaintiffs argue that the police should have arrested Butcher before he shot Titus. Thirteen minutes past between the time when Tywon and Titus arrived at the police station and when Titus was shot. These thirteen minutes include the time that Tywon and Titus spent at the police station talking with Officer Davis and his inspecting their car, the time it took them to drive back to the Flash Store, the time it took Titus to get in an altercation with the Butcher brothers inside the Flash Store, and the time that it took Fred to realize Titus had been shot and call the police. Sardis Police officers were en route to the Flash Store when this call was received.

¶43. We conclude that the Sardis Police acted responsibly and within their discretion. A thirteen minute time span, which includes time at the station talking with Tywon and Titus, approximately three to four minutes when Tywon and Titus were driving back to the Flash Store, and time for the police to establish what course of action to take does not constitute "reckless disregard" for Titus or the general public.

¶44. The Sardis police officers responded promptly when there was a confrontation at the Flash Store earlier in the evening of the shooting. The police officers later investigated the report of a shooting by interviewing Titus and Tywon and by attempting to obtain all relevant information which would assist them and other law enforcement agencies in identifying and locating Butcher, whom the officers had been informed was no longer at the Flash Store. The officers then instructed Titus to stay away from the Flash Store and to let them handle the situation. Titus disregarded these reasonable and proper instructions and

returned to the Flash Store where he started a fight with Butcher, whom Titus knew possessed a gun and apparently was not afraid to use it. This decision resulted in his tragic death. These facts are undisputed, and there are no genuine issues of material fact in the record that support the allegation that the Town of Sardis acted with reckless disregard; rather the record supports the conclusion that the officers provided Titus with as much protection as possible under the circumstances. Accordingly, the trial court correctly granted summary judgment in favor of the Town of Sardis.

¶45. This assignment is without merit.

### IV. WHETHER THERE A GENUINE ISSUE OF FACT AS TO WHETHER TITUS WAS ENGAGED IN CRIMINAL ACTIVITY AT THE TIME HE WAS SHOT.

¶46. The defendants contend that when Titus entered the Flash Store and confronted the Butcher brothers, Titus had in fact had committed four different criminal activities involving simple assault (Miss. Code Ann. § 97-3-7(1)), disturbance in a public place (Miss. Code Ann. § 97-35-13), disturbance of the public peace by offensive language (Miss. Code Ann. § 97-35-15), and refusing to obey a police order (Miss. Code Ann. § 97-35-7). Thus, they argue that the town is exempted from any possible liability to Titus because of his criminal activity.

¶47. Miss. Code Ann. § 11-46-9(1)(c) exempts government entities from liability:

> Arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection *unless the employee acted in disregard of the safety and well-being of any person not engaged in criminal activity at the same time of the injury.*

Miss. Code Ann. § 11-46-9(1)(c) (emphasis added). In order for recovery from a governmental entity to be barred because of the victim's criminal activity, the criminal activity has to have some causal nexus

16

to the wrongdoing of the tortfeasor. *City of Jackson v. Perry*, 764 So.2d 373, 378-79 (Miss. 2000) (holding that a police official could not strike a pedestrian with his squad car during a high speed chase and be exempt from liability just because the pedestrian was in possession of untaxed whiskey).

¶48.    Based on our previous determination that the Sardis Police Department committed no negligence toward Titus and exhibited no reckless disregard for the safety and welfare of Titus or the general public, this issue is dismissed as moot.

## CONCLUSION

¶49.    For these reasons, we affirm the trial court's judgment.

¶50.    **AFFIRMED**.

**McRAE AND SMITH, P.JJ., WALLER, COBB, EASLEY AND GRAVES, JJ., CONCUR.  PITTMAN, C.J., CONCURS IN RESULT ONLY.  CARLSON, J., NOT PARTICIPATING.**