941 So.2d 854 (2006)
Monica MARTIN, Mother, Guardian, and On Behalf of the Minor Children: Denise Patrice Martin, Pascha Monique Smith, Patrick Carnelious Smith, Jr., and Payco Montay Smith, Appellant
v.
RANKIN CIRCLE APARTMENTS d/b/a Mississippi Industrial College Homes, Inc., d/b/a Mississippi Industrial College Homes, Inc. of the Christian Methodist Episcopal Church; Brown & Robinson Systems & Services, P.A.; Mary Frances Robinson In Her Capacity as an Employee of Brown & Robinson Systems & Services; and Robert Young, In His Capacity as an Employee Of Brown & Robinson Systems & Services, All Jointly and Severally, Appellees.
No. 2004-CA-02216-COA.
Court of Appeals of Mississippi.
June 27, 2006.
Rehearing Denied November 7, 2006.
*856 Barrett Jerome Clisby, Oxford, D. Reid Wamble, attorneys for appellant.
Dion Jeffery Shanley, Oxford, John D. Brady, Columbus, attorneys for appellees.
Before MYERS, P.J., SOUTHWICK and IRVING, JJ.
SOUTHWICK, J., for the Court.
¶ 1. The Marshall County Circuit Court granted summary judgment to defendants in a premises liability and wrongful death case. The event that led to the suit was the fatal shooting of a man in the parking lot of an apartment complex. On appeal, the victim's heirs allege that a common law premises liability legal standard should not have been applied, as they seek recovery based on tortious breach of the implied warranty of habitability. Further, even under the premises liability standard, the heirs allege that the victim was an invitee who was owed a duty of reasonable care in providing a safe premises. We conclude that the trial court applied the proper standards and the status of the victim was irrelevant in the grant of summary judgment. We affirm.

FACTS
¶ 2. On April 27, 2001, Patrick Smith was shot and killed by Dontral Campbell in the parking lot of the Rankin Circle Apartments in Holly Springs. Rankin Circle is owned by a division of the Christian Methodist Episcopal Church and managed by Brown & Robinson Systems. They, along with Mary Frances Robinson and Robert Young, are the defendants in this suit. Plaintiffs are Monica Martin, who was Patrick Smith's girlfriend and mother of his children; Smith's mother; and other relatives. We will at times refer to all plaintiffs as "Martin."
¶ 3. The victim Smith and Monica Martin were the parents of four children and were said to be planning to be married. The shooting occurred after a series of events that was set in motion months earlier when Martin learned that Smith may have fathered another woman's child.
¶ 4. At about noon on the day of the shooting, Martin completed her shift at work and drove from Oxford to Holly Springs to visit her sister who lived at Rankin Circle, the apartment complex at which the shooting later occurred. When she arrived, Smith's brother asked her to take him to a restaurant. Martin agreed. On the way, Martin noticed that she was being followed by LaKenya Hubbard, the woman who allegedly had been impregnated by Smith. Martin took Smith's brother to a restaurant. Then she drove back to Rankin Circle. When she arrived she noticed Smith was frying fish with various other people. She drove through Rankin Circle, exited, and started toward another residential area. Martin described her actions as "joy-riding."
¶ 5. At some point during the drive, Martin again noticed she was being followed by Hubbard. Various other people were in Hubbard's vehicle. Hubbard would follow Martin for a time, then Martin would tauntingly follow Hubbard. After a while, Martin stopped at another apartment complex where Hubbard had *857 parked. While both vehicles were parked, someone from the Hubbard car approached Martin. Martin rolled down her window. The Hubbard emissary began to question Martin as to the nature of her business with Hubbard. After a discussion, the person returned to the Hubbard group, and Martin drove away.
¶ 6. Martin returned to Rankin Circle. There, she picked up Patrick Smith and informed him of the earlier encounter with Hubbard. The two agreed to return to the complex where Martin had left Hubbard. They were followed in another car by their four children and various friends.
¶ 7. En route to the other location to find Hubbard, they noticed Hubbard and others on a street near Rust College. Martin immediately made a U-turn to follow them. Martin caught up to Hubbard. Both groups stopped at a residence owned by one of Hubbard's cousins, Cedric Hampton. There were a number of people gathered at the Hampton residence.
¶ 8. Smith exited the car and confronted Hubbard about her earlier following of Martin. He told Hubbard that he did not want a relationship with her. He also told her to leave Martin alone. Others exchanged angry words, with Martin at some point refusing to fight Hubbard.
¶ 9. Smith got back into the car and headed back to Rankin Circle. As the Smith group was parking, Hampton appeared, flanked by another male, and confronted Smith. Soon Dontral Campbell, the person who would kill Smith, arrived and joined in the argument in favor of Hampton. The argument ended and Campbell and Hampton got into Hampton's car and drove away.
¶ 10. Martin then decided that she wished to resume riding in her car. She and her four children departed, this time without Smith. A half hour later, Martin returned to Rankin Circle. It was around 11:00 p.m. She saw a group of people assembled. Smith and Campbell were again arguing. The nature of this argument is unclear, as there are many perspectives about it in the record. Regardless of details, the argument was an angry one.
¶ 11. There is some conflict in the record as to when a gun first appeared. There is also conflict as to when the participants learned that Campbell was carrying a weapon, though most recognized Campbell as being armed. The argument raged, culminating in Campbell's shooting Smith twice in the side. Some bystanders dragged Smith between two cars to shield him from further shots. Campbell fired a few more shots and fled. Smith died hours later.
¶ 12. Martin testified that before moving to Oxford, she had lived in Rankin Circle for seventeen years in the same building and apartment. Martin said that she and Smith met at Rankin Circle as children. She had known property manager, Mary Frances Robinson, for her entire life.
¶ 13. Robinson's testimony was that she was aware of dangerous conditions at Rankin Circle and did her utmost to address the safety problems there. These are the measures that she was shown to have taken: (1) She kept regular business hours at her Rankin Circle office. (2) She arranged with Officer Robert Young of the Holly Springs Police Department to provide part-time security for the complex, in exchange for a rent-free apartment. This arrangement was still in place during April 2001, but Young was not present on the evening of the shooting. (3) In addition to Young, Robinson herself patrolled the complex. She had attended apartment security workshops given by the U.S. Department of Housing and Urban Development. *858 Also, she had been appointed as an auxiliary policewoman by the mayor of Holly Springs. She had previously made a "citizen's arrest" of two people by forcing them in her car and driving them to the police station. (4) She posted "No Loitering" signs and a notice that guests should be inside their apartments while on the property. (5) Robinson filed numerous trespassing complaints during the previous year against undesirables who had been loitering on the property. (6) She maintained a list of people whom she would not allow on the property. (7) She placed additional lighting in the Rankin Circle parking lot prior to the shooting. (8) She gated the complex, but local authorities forced her to remove the gate so that there would be proper access and exit in case of a fire.
¶ 14. Robinson said she knew the shooter Campbell and was aware of his criminal record. She was also aware that Campbell had shot two other people, including Campbell's own brother.
¶ 15. Rankin Circle was subsidized by HUD under the Section Eight program, a feature of which was providing grant money to reimburse local law enforcement agencies for security protection. Robinson testified that she was unaware of any private security company then doing business in Marshall County. As part of its regulation of the complex, HUD performed an annual evaluation of the property and did not require that the property manager provide security personnel.
¶ 16. Holly Springs Chief of Police John Deal testified that Rankin Circle constituted a high crime area, specifying domestic violence and drug crime. Every witness giving testimony in the record agreed that Rankin Circle was a high crime area despite Robinson's efforts.

DISCUSSION
¶ 17. On summary judgment, the trial judge applied caselaw concerning the liability of business premises owners for the acts of criminals on their property. The plaintiffs argue that the circuit judge applied the wrong legal standard. Instead, we are urged to apply a warranty of habitability.
¶ 18. Since the trial judge granted a motion for summary judgment, we review his decision from the same perspective and applying the same standards as should have been used below. The evidence such as affidavits, depositions, and documents, along with all inferences that could be made from that evidence, are viewed by us in the light favorable to the non-moving party. Travis v. Stewart, 680 So.2d 214, 216 (Miss.1996). We evaluate anew whether the evidence submitted on the motion reveals that there is no dispute of material fact and whether because of such lack of dispute, the moving part is entitled to judgment as a matter of law. M.R.C.P. 56(c); McCullough v. Cook, 679 So.2d 627, 630 (Miss.1996). Summary judgment cannot substitute for a trial to resolve disputes of material fact, but neither should a trial on undisputed material facts substitute for a summary judgment. Wolf v. Stanley Works, 757 So.2d 316, 319 (Miss.Ct.App.2000).
¶ 19. We have summarized the evidence already. At points we indicated that there was understandable disagreement about certain details in the events that occurred late at night among groups of people antagonistic towards each other. The trial judge determined that such facts as were genuinely disputed were immaterial. Martin's appellate challenge to that ruling is not so much that there were material factual disputes, but rather that the undisputed facts did not prove the defendants entitled to judgment as a matter of law.
*859 ¶ 20. There are five issues presented to us on appeal. All approach the question of the proper legal theory to apply, and whether disputes of material fact arise under that theory. We reorganize the appellate complaints into two parts. First we will discuss the law and relevant facts that Martin argues should have been applied. Then we examine what the trial court actually did. In that division we seek proper resolution of the legal ramifications of the shooting on these premises.
1. Implied warranty of habitability
¶ 21. There is an implied warranty of habitability for residential leases. The warranty was first recognized in a Supreme Court concurring opinion in 1991. O'Cain v. Harvey Freeman & Sons, 603 So.2d 824, 831 (Miss.1991) (Sullivan, J., concurring, joined by court majority). The event that led to the O'Cain litigation was an assault on the tenant of an apartment. The alleged negligence was an inadequate lock on the sliding door from the patio into the apartment. Id. at 825-26. The plaintiff was not the assaulted tenant but instead was a roommate who claimed emotional distress from the assault on her friend. The O'Cain majority found that a claim could be presented under traditional negligence principles: if the lock was defective, was a latent defect of which the tenant or guest had no knowledge, and was a proximate cause of allowing the criminal access, and if that entry and the injuries claimed by the plaintiff were reasonably foreseeable, the elements of a negligence suit existed. Id. at 829-31. The concurring opinion agreed with allowing the litigation to proceed, but addressed more generally the tension that the judge found between long-existing caveat emptor rules applicable to landlords' obligations to tenants and the realities of a "shift away from agrarian life. . . ." Id. at 831 (Sullivan, J., concurring). The concurring justices, which constituted a majority of the court, believed that the "[m]ore progressive courts" had implied a warranty of habitability into the "modern landlord-tenant relationships," effectively ending caveat emptor. Id.
¶ 22. The concurrence favored an implied warranty of habitability for residential leases:
Such a holding would be in line with the recent legislative enactment of the Residential Landlord and Tenant Act (RLTA), H.B. No. 293, Regular Sess. 1991 (effective July 1, 1991), which requires a landlord to "comply with the requirements of applicable building and housing codes materially affecting health and safety" and to "[m]aintain the dwelling unit, its plumbing, heating and/or cooling system, in substantially the same condition as at the inception of the lease" RLTA, H.B. No. 293, section 12(a) & (b) (Emphasis added). Although the legislature did not expressly impose a duty upon landlords to provide and maintain fit and habitable premises, by allowing tenants the right to repair defects and receive reimbursement of the expenses of such repairs which violate the obligations of the landlord, see RLTA, H.B. No. 293, section 8, the Legislature has implicitly recognized an implied warranty of habitability with the standard being the building and housing codes.
Id. at 832. Under that implied warranty, the landlord owed a duty "to use reasonable care to provide safe premises at the inception of the lease." Id. at 833.
¶ 23. How to interpret the O'Cain concurring opinion is best answered by examining the clarifications and elaborations since then. The Mississippi Supreme Court's first application of O'Cain emphasized that the implied warranty of habitability *860 does not create negligence per se for housing code violations. Sweatt v. Murphy, 733 So.2d 207, 210 (Miss.1999). Quoting the O'Cain concurrence, the Sweatt court endorsed this formulation of the warranty:
Recognizing that building and housing codes which affect health and safety generally are often governed locally, I advocate that the bare minimum standard for an implied warranty of habitability should require a landlord to provide reasonably safe premises at the inception of a lease, and to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by the tenant, unless expressly waived by the tenant.
Id., quoting O'Cain, 603 So.2d at 833 (Sullivan, J., concurring).
¶ 24. The warranted safety that the plaintiffs argue their deceased was not provided was freedom from criminal actions. Unlike O'Cain, here there is no allegation of an undeniably repairable defect in the property such as a broken lock. Instead, the claim is based on the atmosphere of violence and crime at this apartment complex and the defendants' failure to remove the threats. At summary judgment, the plaintiffs claimed such defects as that there was no effective management plan to deal with crime, that community counseling and seeking feedback from residents would have helped develop such a plan, and that the security guard was absent the night of the shooting. Whether this warranty is relevant to such crime prevention considerations is what we now examine.
¶ 25. We have reviewed each of the thirteen reported precedents starting with O'Cain that interpret Mississippi law and use O'Cain or the warranty that it recognized in the premises liability context. Only in the O'Cain concurring opinion is the implied warranty of habitability discussed as relevant to a landlord's duty to protect against criminal conduct. We have quoted relevant excerpts from that opinion. It is evident that those judges are using the vehicle of the O'Cain appeal to urge the abandonment of caveat emptor in the landlord-tenant relationship. Reliance by the concurrence on the then-recent Residential Landlord and Tenant Act, which is not focused on protections against criminals but instead on more general standards arising under local housing codes, is also an indication of the reach of the warranty. O'Cain, 603 So.2d at 832.
¶ 26. Three of the later opinions citing O'Cain involve injuries arising from crimes, but those opinions refer to the O'Cain majority opinion and its analysis of general premises liability. O'Cain, 603 So.2d at 830. We will later review those three opinions. Before doing so, we look at the more common uses of O'Cain. The vast majority of the implied warranty litigation concerns general physical defects on the premises. E.g., Stonecipher v. Kornhaus, 623 So.2d 955 (Miss.1993) (seller of home liability to purchaser for a tree which fell on the property); Green v. Dalewood Property Owners Association, Inc., 919 So.2d 1000 (Miss.Ct.App.2005) (association of owners allegedly failed to keep premises reasonably safe for visitor).; Sample v. Haga, 824 So.2d 627 (Miss.Ct. App.2001) (landlord liability for death of guests in house fire); Houston v. York, 755 So.2d 495 (Miss.Ct.App.1999) (landlord and contractor negligence in installation of a fireplace mantel that fell and injured tenant). This utilization is consistent with the O'Cain concurrence's focus, that tenants were impliedly owed in all leases compliance with basic housing standards.
¶ 27. We now examine the three opinions that refer to O'Cain when analyzing responsibility to protect tenants against *861 criminals. In one precedent, an employee of a lawyer whose office was in a high-crime area was assaulted. Simpson v. Boyd, 880 So.2d 1047, 1052 (Miss.2004). The issue of negligence per se was discussed, since there was a local ordinance that required buildings to have emergency exits. Quoting the O'Cain majority opinion and not the concurrence, the court found that "the question of superceding intervening cause [arising from the actions of a criminal] is so inextricably tied to causation, it is difficult to imagine a circumstance where such an issue would not be one for the trier of fact." Id. at 1053, quoting O'Cain, 603 So.2d at 830. We will discuss in the next section of our opinion the question of intervening cause.
¶ 28. Another precedent applying Mississippi law and citing O'Cain in relation to a crime on premises also just referred to the majority opinion and not to the concurrence. Whitehead v. Food Max of Mississippi, Inc., 163 F.3d 265 (5th Cir.1998). The property on which the assault occurred was a grocery store and no warranty of habitability was discussed.
¶ 29. A decision from this Court also cited the O'Cain majority opinion and never mentioned the concurrence or a warranty. Price v. Park Management, Inc., 831 So.2d 550 (Miss.Ct.App.2002). We concluded that a landlord was not liable where a tenant's guest was assaulted on the premises. This Court found that a landlord owed the guest only the duty to refrain from wanton or wilful injury. Id. at 551-52. More recently, we cited Price for the same principle. Minor Child v. Miss. State Fed. of Colored Women's Club Housing for the Elderly in Clinton, No.2005-CA-00055, 941 So.2d 820, 2006 WL 696455 (Miss.Ct.App. March 21, 2006). Apparently the plaintiff in neither case raised the habitability warranty. Two expert commentators have found Price inconsistent with another one of our precedents. WEEMS & WEEMS, MISSISSIPPI LAW OF TORTS, § 5-6 (Supp.2005) (comparing Price to Joiner v. Haley, 777 So.2d 50, 52 (Miss.Ct. App.2000), and finding that the guest in Price would under Joiner have been owed reasonable safety). We will review Joiner next.
¶ 30. The remaining decisions citing O'Cain do not involve criminal conduct as the source of injury. The suits concern defects in the leased property that caused an accidental injury. The first and most thorough explanation of the interplay of the implied warranty of habitability and general premises liability rules was in an opinion by Chief Judge McMillin of this Court. Joiner, 777 So.2d 50. In that suit, the plaintiff alleged that a building project on a rented house had been left in a dangerous condition. Construction of a second floor balcony was commenced then stopped, with a doorway into thin air one floor above a concrete patio left unsecured. The plaintiff as a guest at a party held by the renter of the house opened the door and stepped out in order to get fresh air. She was seriously injured in the fall. Id. at 51. We concluded that there was "no reason why Joiner should not be permitted to advance a claim sounding in tort against the premises owner, the cause of action having as its foundation a tortious breach of the implied warranty of habitability standard announced in O'Cain rather than requiring Joiner, as a matter of law, to proceed under previously-existing premises liability decisions." Id. at 52. We found fact issues of whether this second-floor doorway into nothingness "was an unreasonably dangerous condition affecting the habitability of the premises," and whether the efforts that were taken to secure the door against inadvertent opening were reasonable. We also concluded that a guest of a tenant would be a proper *862 plaintiff to assert damages arising from breach of the warranty. Id.
¶ 31. Our opinion in Joiner could not alter that a suit under the warranty "is, in essence, a negligence action" in which the "the standard tort defenses" such as "intervening cause" would apply. Sweatt, 733 So.2d at 211-12, quoting O'Cain, 603 So.2d at 833. Though the implied warranty arises because of a contractual relationship, breaches of the warranty sound in tort.
¶ 32. We will discuss in the next section a standard tort defense that is significant in the final resolution of this case: the knowledge of the injured person of the dangers on the premises will prevent recovery for a failure to warn. We find that this defense is consistent with the obligation of a landlord under the warranty to "provide reasonably safe premises at the inception of a lease, and to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by the tenant, unless expressly waived by the tenant." Sweatt, 733 So.2d at 210, quoting O'Cain, 603 So.2d at 833 (Sullivan, J., concurring). The dangers of crime at Rankin Circle were well-known by all and steps were taken to address the problems.
¶ 33. We find no support in the precedents that the Supreme Court has created dual and inconsistent principles for gauging the reasonableness of landlords' general conduct as to crime, one arising from the usual negligence analysis and the other applicable to the "in essence" negligence actions that assert a warranty of habitability. The implied warranty of habitability is not a useful alternative perspective to view whether defendants should have had security guards, a crime management plan, or other heightened measures to respond to an atmosphere of crime. In O'Cain, the possible defect in a lock on the apartment door, and whether that defect led to a criminal assault, are the kind of issues that fit smoothly within the "bare minimum" building and housing code standards that O'Cain relied upon when a majority of the court abandoned the traditional caveat emptor doctrine for real property leases. O'Cain, 603 So.2d at 832. The plaintiffs are seeking far more than bare minima at Rankin Circle Apartments.
¶ 34. Though some states have analyzed liability for third party criminal acts against tenants as part of the warranty of habitability, others have not found the warranty controlling. 1 FRIEDMAN ON LEASES, § 10:1:9[F], at 10-69 (5th ed. 2005). Whatever the doctrinal label, the result of a claim that an atmosphere of violence existed is the one reached under premises liability rules.
¶ 35. We now turn to the present legal standards for determining whether there has been a tortious breach of the premises liability duties owed by a landlord to a tenant.
2. Premises liability
¶ 36. Much attention is given on appeal to, and for the trial judge and defendants, controlling authority is found in a relatively recent Supreme Court precedent. Titus v. Williams, 844 So.2d 459 (Miss.2003). The plaintiffs deny the relevance of Titus because it is a common law premises liability decision and not one based on a tortious breach of the implied warranty of habitability. However, we have already compared the analysis that would arise under the warranty theory and find that it leads us into negligence law. A careful review of Titus is in order.
¶ 37. Milton Titus, III was shot and killed by a third party in the parking lot of a convenience store. The store did not employ a security guard, though a guard *863 had been used by previous owners. The subject store and surrounding area was well known for its illegal activity, including fights and drug deals. The shooting came out of an argument over a woman when Titus, who was not privy to the initial argument, appeared and entered the argument. The situation quickly worsened and Titus was killed. Id. at 462-64. Titus's heirs brought suit against the convenience store. The Supreme Court affirmed the circuit court's grant of summary judgment to the defendants.
¶ 38. The court started with the issue of whether the dangerous conditions constituted active or affirmative negligence by the store owners. See Hoffman v. Planters Gin Co., 358 So.2d 1008 (Miss.1978). The Titus court interpreted Hoffman as finding that a premises owner owed a duty of ordinary care even to an invitee, when an affirmative act of the owner "subjects a licensee to unusual danger or increases the hazard to the licensee when the presence of the licensee is known." Titus, 844 So.2d at 465. The court found negligence that created the conditions leading to injury, such as failure to prevent criminal conduct, but that did not initiate the injury-causing actions themselves, could not be the basis for applying the Hoffman affirmative negligence doctrine. Id. at 466. The court analyzed this as an absence of proximate cause, which is defined as the "cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury and without which the result would not have occurred." Id., quoting Delahoussaye v. Mary Mahoney's, Inc., 783 So.2d 666, 671 (Miss.2001). The court held the Titus store owner was not actively negligent despite that "an atmosphere of violence" existed on the store premises, the owner knew this, and failed to rectify the problems. Titus, 844 So.2d at 466-67.
¶ 39. The Titus court retained the distinctions between an invitee, licensee, and trespasser in premises liability cases. Id. One of the issues raised by the plaintiffs in our appeal is that they should be considered invitees. The common law analysis employing these distinctions is a three-step process. First, a determination is made of one's status as invitee, licensee, or trespasser. Second, a determination is made of the duty owed the person by the premises owner. Third, a determination is made of whether the premises owner breached the duty. Id. at 467.
¶ 40. For invitees, the owner must keep the premises reasonably safe and warn only of hidden danger. Invitee status falls on those who enter property at the express or implied invitation of the owner or occupant to their mutual advantage. A licensee enters property only for his own advantage but also has the implied permission of the owner. A trespasser is a person who enters without any right at allbe it express or impliedand does so merely for his own purposes. Property owners owe both trespassers and licensees the duty to refrain from willful or wanton injury. Id. The defendants in our case believed Smith was a trespasser.
¶ 41. The court found that, although initially a licensee, Titus became a trespasser on the store property when he returned intent upon fighting. Id. The status, though, was irrelevant. The broadest duty owed anyone who enters on a landowner's property was to provide reasonably safe premises and to warn of hidden dangers. The key holding in Titus is "that the duty to warn disappears entirely when it is shown that the injured person did, in fact, observe and fully appreciate the peril." Id., quoting Ill. Cent. R.R. v. Crawford, 244 Miss. 300, 315, 143 So.2d 427, 431 (1962).
*864 ¶ 42. Turning now to the undisputed facts in the present case, it is evident that the deceased Smith was fully cognizant of the developing dangers around him. To the extent his heirs argue that allowing a atmosphere of danger to exist at this location was a breach of the defendant's duty, the deceased had been participating in that atmosphere for a substantial period of time before the actual shot was fired. He had been in a position to "observe and fully appreciate the peril" that was imminent, given the day's events of which he had clearly been a part. Moreover, the deceased was not a stranger to these apartments and whatever atmosphere existed there. Martin testified that she and the deceased, Patrick Smith, met during their childhood at Rankin Circle. Smith had some contact with Rankin Circle for a significant portion of his life.
¶ 43. What we have at most in the present case is that the defendants "furnished the condition" in which the shooting occurred but did not "put in motion" the shooting itself. Titus, 844 So.2d at 466, quoting Newell v. Southern Jitney Jungle Co., 830 So.2d 621, 623 (Miss.2002). In Newell, the Supreme Court held that it would not attach strict liability to property owners for injuries occurring on the premises "as a result of criminal acts by third parties." Id. at 624. In our case, the shooter Campbell's appearance at the complex is an intervening cause as is recognized both in premises liability decisions such as Titus and in the warranty of habitability cases such as Sweatt. Nearly every witness testified to knowing of Campbell's reputation for criminal activity and violence and that Patrick Smith was involved with drugs. The defendants did not "put in motion" the events leading up to the shooting. The deceased needed no further warnings than he received.
¶ 44. Martin argues that an outcome-changing distinction is that the shooting in Titus occurred at a store instead of a residential area. We find no relevance to the duty owed based on that distinction. As in Titus, there was here an absent property owner (the Christian Methodist Episcopal Church) and a landlord who operated and controlled Rankin Circle (Mary Frances Robinson). To the extent there was an "atmosphere of violence" surrounding Rankin Circle, Robinson had tried to address the problem. An equally important condition underlying the shooting was the accelerating animosities arising during the fatal night's driving encounters among the principals in this event. It is true that the implied warranty of habitability applies in residential situations, but we have already discussed why that warranty does not assist the plaintiffs here.
¶ 45. The Mississippi Supreme Court has refused to make owners the insurers of an invitee's safety. Strict liability is not imposed on them in premises liability cases. Corley v. Evans, 835 So.2d 30, 41 (Miss.2003). Unless those boundaries are crossed, the judgment here was correct.
3. Other issues
¶ 46. The plaintiffs argue other theories, such as negligent infliction of emotional distress. We find that our conclusions as to the defendants' non-negligent performance of their duty under premises liability principles removes the necessary negligence or even intentional conduct that must be found under the other theories.
¶ 47. THE JUDGMENT OF THE CIRCUIT COURT OF MARSHALL COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
*865 KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE AND ROBERTS, JJ., CONCUR. BARNES, J., NOT PARTICIPATING.